[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-15123
_____

D. C. Docket No. 08-00975-CV-TWT-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 15, 2010
JOHN LEY
CLERK

DAN TANA,

Plaintiff-Appellant,

versus

DANTANNA'S,
an unknown business entity,
GREAT CONCEPTS, L.L.C.,
a Georgia Limited Liability Company,
DANTANNA'S CNN CENTER, LLC,
a Georgia limited liability company,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(July 15, 2010)

Before EDMONDSON, CARNES and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This trademark infringement action concerns two restaurants, situated on opposite sides of the country, that share very similar names. Dan Tana, owner of Dan Tana's restaurant in Hollywood, California ("Plaintiff"), brought this action against the two limited liability companies that own and operate the Dantanna's restaurants in Atlanta, Georgia—Great Concepts, L.L.C., and Dantanna's CNN Center, LLC ("Defendants"). Plaintiff's complaint alleges that David Clapp, founder of the Dantanna's restaurants and managing member of the Defendants, intentionally selected and registered as a federal trademark a name for his restaurants that is confusingly similar to the name of Plaintiff's restaurant in Hollywood. The claims forming the basis of Plaintiff's complaint are false designation of origin, a theory of federal trademark infringement arising under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count I); deceptive trade practices under Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-370 et seq. (Count II); fraud pursuant to O.C.G.A. § 23-2-55 (Count III); and the unauthorized appropriation of likeness, an invasion-of-privacy tort recognized under Georgia law (Count IV).[1]

The district court granted summary judgment in favor of Defendants on all

---

[1] Plaintiff's complaint also included, and the district court also rejected, a state-law claim for unjust enrichment (Count V), which Plaintiff chose not to appeal in this action.

counts.  Plaintiff now appeals, arguing that triable issues of fact remain as to whether there is a likelihood of confusion between the two restaurants and whether Defendants intentionally appropriated the name of his restaurant.  Because we conclude that Plaintiff has not adduced sufficient evidence giving rise to a genuine issue of material fact on the issue of likelihood of confusion or Defendants' knowing appropriation of his likeness, we affirm the district court's grant of summary judgment in favor of Defendants.

## I.  FACTS AND PROCEDURAL HISTORY

Plaintiff Dan Tana is a self-described former Yugoslav soccer star, prominent restaurateur, film producer, and actor.  He opened his Italian-themed restaurant, Dan Tana's, in West Hollywood, California, in 1964.  Since that time, the restaurant has enjoyed a storied history, attracting Hollywood celebrities and insiders to the restaurant's intimate and romantic setting.  Dan Tana's serves traditional Italian fare, and it resembles an old-world Italian trattoria with red-and-white checkered table cloths and straw-colored wine flasks hanging from the ceiling.  Plaintiff, who has been the sole owner of the restaurant since its inception, figures prominently into its ambiance, personally greeting and welcoming his patrons.  The Press has referred to Dan Tana's as a "legendary Hollywood hotspot" and the ultimate "LA hangout," and the restaurant has been featured in numerous

3

newspapers, magazines, and books. The name "Dan Tanna" received significant publicity in the 1970s when producer Aaron Spelling asked Plaintiff for the use of his name for the lead character in his television series "Vega$."

Despite the notoriety of Plaintiff's restaurant, Plaintiff did not attempt to register the name "Dan Tana's" with the Patent and Trademark Office ("PTO") until June 2005, forty-one years after his restaurant's opening. The PTO denied his application in December 2005 on the basis of the existing registration of the trademark "Dantanna's" in the same category of restaurant services sought by Plaintiff. Defendants had opened the first of two Dantanna's locations in Atlanta in 2003, applied for a federal registration in June 2003, and obtained federal registration of the name "Dantanna's" in March 2005, claiming a date of first use of September 30, 2003.[2]

The Dantanna's restaurants are upscale sports restaurants serving contemporary American cuisine with a "surf and turf" theme. The restaurants' large open floor plans boast big screen televisions tuned to sports channels on surrounding walls. According to its website, Dantanna's specializes in providing a sophisticated and elegant venue for the viewing of sporting events and strives to

---

[2] At the time Plaintiff filed this lawsuit, Defendants operated only one location of Dantanna's in Atlanta's Buckhead neighborhood. They have since expanded to a second location in downtown Atlanta.

emulate the feeling of sitting in a "private box at your favorite game."

In June 2006, Plaintiff filed a Petition for Cancellation of Defendants' mark with the PTO's Trademark Trial and Appeal Board, alleging that Defendants sought to mislead the public into believing their restaurant was associated with Dan Tana's Hollywood. Subsequently, Plaintiff filed a federal trademark infringement suit in United States District Court for the Central District of California, which was ultimately dismissed for lack of personal jurisdiction over one of the Defendants. After Plaintiff filed his federal lawsuit, he moved to suspend the trademark cancellation proceeding pending before the PTO. The PTO stayed the proceeding in September 2007.

Plaintiff then filed this lawsuit in the Northern District of Georgia in March 2008, pleading the federal and Georgia trademark infringement, fraud, and tort claims at issue in this appeal. Plaintiff's complaint seeks a permanent injunction enjoining Defendants from all future use of the "Dantanna's" mark and the cancellation of Defendants' federal trademark registration, among other relief. Defendants moved for summary judgment arguing that, as a matter of law, Plaintiff could not establish the likelihood of confusion necessary to subject them to liability under § 43(a) of the Lanham Act, Georgia's Uniform Deceptive Trade Practices Act, or fraud under Georgia law, nor could Plaintiff establish the intentional

5

appropriation of likeness required to impose liability under Georgia tort law. The district court agreed, granting summary judgment in favor of Defendants as to all counts. This appeal ensued.

## II. DISCUSSION

We review the grant of summary judgment <u>de novo</u>, applying the same legal standards as the district court. <u>Harrison v. Benchmark Elecs. Huntsville, Inc.</u>, 593 F.3d 1206, 1211 (11th Cir. 2010). In so doing, we view all evidence and draw all reasonable inferences in favor of the non-moving party. <u>Id.</u> Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c).

Plaintiff appeals the district court's disposition of four counts of his federal complaint: (1) false designation of origin under § 43(a) of the Lanham Act, (2) deceptive trade practices under Georgia's Uniform Deceptive Trade Practices Act, (3) fraud under O.C.G.A. § 23-2-55, and (4) appropriation of likeness under Georgia tort law. However, we need not separately address whether Defendants were entitled to summary judgment on Plaintiff's deceptive trade practices or fraud claims. The district court held that the Georgia Uniform Deceptive Trade Practices Act and § 23-2-55 require a plaintiff to prove the same elements as a claim for

6

federal trademark infringement under the Lanham Act. Because this is a question of state law that the parties do not challenge on appeal, we treat the district court's holding as correct and merely determine whether the district court properly decided the Lanham Act count. See Jellibeans, Inc. v. Skating Clubs of Ga., Inc., 716 F.2d 833, 839 (11th Cir. 1983). "If we determine that the district court decided the Lanham Act count properly, we will also affirm its decision on the Georgia deceptive trade practices [and fraud] counts." Id. Thus, we first address Plaintiff's Lanham Act claim and then consider his Georgia appropriation-of-likeness claim.

A. Trademark Infringement under § 43(a) of the Lanham Act

Trademarks are "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127.[3] Section 43(a) of the Lanham Act creates a federal cause of action for

---

[3] The parties consistently refer to this case as involving registered and common law "trademarks" throughout their appellate briefs, but, because both parties use their marks in association with services in addition to goods bearing the restaurants' names, their marks are also properly characterized as "service marks." 15 U.S.C. § 1127 (Service marks are "any word, name, symbol, or device, or any combination thereof [used] . . . to identify and distinguish the services of one person . . . from the services of others and to indicate the source of the services . . . ."). The analysis is the same for service mark and trademark infringement. Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330, 1334 n.1 (11th Cir. 1999) ("The infringement analysis is the same under both standards and courts thus treat the two terms as interchangeable in adjudicating infringement claims."). For simplicity and consistency, however, we will continue to refer to this action as one for trademark, as opposed to service mark and trademark, infringement.

unfair competition by prohibiting the use in interstate commerce of any "word, term, name, symbol or device, . . . or any false designation of origin . . . which is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a).[4] To establish a prima facie case of trademark infringement under § 43(a), a plaintiff must show "(1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir. 1997).[5] Plaintiff's allegation under the Lanham Act is that "Dan Tana's" is a trade

---

[4] Section 43(a) of the Lanham Act provides:
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a).

[5] In its summary judgment order, the district court erroneously stated that Plaintiff brought this action under § 32(a) of the Lanham Act, 15 U.S.C. § 1114(1), rather than § 43(a), 15

8

name in which he has common-law trademark rights and that Defendants are unlawfully infringing on those rights by using and registering the name "Dantanna's" in connection with the operation of their Atlanta restaurants.

To satisfy the first element of § 43(a)—proof of a valid trademark—a plaintiff need not have a registered mark. We have recognized that "the use of another's unregistered, i.e., common law, trademark can constitute a violation of § 43(a) where the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a false representation that its goods came from the same source." Conagra, Inc. v. Singleton, 743 F.2d 1508, 1512–13 (11th Cir. 1984) (internal quotations and citations omitted). However, only those marks that are capable of distinguishing the owner's goods from those of others, i.e., that are sufficiently "distinctive," are eligible for federal registration or protection as

_____

U.S.C. § 1125(a). Section 32(a) creates a cause of action for the infringement of a registered mark, whereas § 43(a) protects qualifying unregistered trademarks. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 2757 (1992). This error is irrelevant, however, because the district court based its grant of summary judgment on the likelihood-of-confusion prong of § 32(a), which requires the consideration of the same seven factors as § 43(a)'s likelihood-of-confusion test, and therefore applied the correct legal analysis to Plaintiff's infringement claim. See Ross Bicycles, Inc. v. Cycles USA, Inc., 765 F.2d 1502, 1503–04 (11th Cir. 1985) ("The factors relevant to establishing [a likelihood of confusion with respect to false designation of origin under 15 U.S.C. § 1125(a)] are identical to the factors relevant to establishing a likelihood of confusion with respect to trademark infringement under 15 U.S.C. § 1114." (citation omitted)).

9

common law marks under the Lanham Act.  15 U.S.C. § 1052(e), (f); Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S. Ct. 2753, 2757 (1992); Coach House Rest., Inc. v. Coach & Six Rests., Inc. 934 F.2d 1551, 1559 (11th Cir. 1991).

Our circuit recognizes four categories of distinctiveness, listed in ascending order of strength: "(1) generic—marks that suggest the basic nature of the product or service; (2) descriptive—marks that identify the characteristic or quality of a product or service; (3) suggestive—marks that suggest characteristics of the product or service and require an effort of the imagination by the consumer in order to be understood as descriptive; and (4) arbitrary or fanciful—marks that bear no relationship to the product or service, and the strongest category of trademarks." Gift of Learning Found., Inc. v. TGC, Inc., 329 F.3d 792, 797–98 (11th Cir. 2003). Suggestive and arbitrary or fanciful marks are deemed "inherently distinctive" because "their intrinsic nature serves to identify a particular source of a product" and are generally entitled to trademark protection.  Two Pesos, 505 U.S. at 768, 112 S. Ct. at 2757.   Generic marks, on the other hand, are generally incapable of receiving trademark protection and may never be registered as trademarks under the Lanham Act.  Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1358 (11th Cir. 2007); Coach House Rest., 934 F.2d at 1560.  Descriptive marks, though not inherently distinctive, may become sufficiently distinctive to enjoy trademark

10

protection by acquiring "secondary meaning." 15 U.S.C. § 1052(f); Coach House Rest., 934 F.2d at 1560. "A name has acquired secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer." Welding Servs., 509 F.3d at 1358 (internal quotation and citation omitted).

"Names—both surnames and first names—are regarded as descriptive terms and therefore one who claims federal trademark rights in a name must prove that the name has acquired a secondary meaning." Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 125 (4th Cir. 1990); 815 Tonawanda St. Corp. v. Fay's Drug Co., Inc., 842 F.2d 643, 648 (2d Cir. 1988) (same); see also 15 U.S.C. § 1052(e) (providing that if a mark is "primarily merely a surname" the PTO may deny it federal registration); Conagra, 743 F.2d at 1513 (requiring a showing of secondary meaning for a surname to give rise to enforceable trademark rights). However, Defendants presumed the validity of Plaintiff's mark in their summary judgment motion below and only contested the second element of Plaintiff's trademark infringement claim—the likelihood of confusion between the two marks. The district court disposed of Plaintiff's suit solely on this ground, never reaching the issue of trademark validity. Therefore, we also proceed on the assumption that Plaintiff holds valid common-law trademark rights in the name "Dan Tana's" and

11

turn to the second element of Plaintiff's Lanham Act claim, the likelihood of

confusion.[6]

i.      *Likelihood of Confusion*

In evaluating whether there is a likelihood of confusion between two marks,

our court applies a multifactor test, evaluating the following seven factors: (1)

strength of the mark alleged to have been infringed; (2) similarity of the infringed

and infringing marks; (3) similarity between the goods and services offered under

the two marks; (4) similarity of the actual sales methods used by the holders of the

marks, such as their sales outlets and customer base; (5) similarity of advertising

methods; (6) intent of the alleged infringer to misappropriate the proprietor's good

will; and (7) the existence and extent of actual confusion in the consuming public.

Welding Servs., 509 F.3d at 1360.  On appeal, Plaintiff argues that there is a

material issue of fact on the likelihood of confusion between his and Defendants'

mark, precluding summary judgment, and that the district court erred in considering

the geographical proximity of the parties' use of their marks as an additional

---

[6]      Nonetheless, we revisit the issue of secondary meaning in evaluating the first factor in our circuit's likelihood-of-confusion test because secondary meaning is relevant to both elements of a Lanham Act claim.  Whether a mark is generic, descriptive, suggestive, or arbitrary also plays into its strength, which is the first factor of our likelihood-of-confusion inquiry.  See Welding Servs., 509 F.3d at 1360; J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:82 (4th ed. 2010) (explaining that secondary meaning is an issue of validity for noninherently distinctive marks and also an issue of strength/distinctiveness in the likelihood-of-confusion analysis for any kind of mark).

relevant factor in its likelihood-of-confusion analysis. Plaintiff cannot prevail on

either argument.[7]

We agree with the district court that the only factors that could plausibly

support a finding of a likelihood of confusion are the similarity of the marks (factor

two) and the undisputed similarity of the parties' sales methods (factor four).

Plaintiff's and Defendants' marks share an identical spelling but for a single letter

and the use of a space, an identical use of the possessive, and an identical

---

[7]     We also summarily dismiss Plaintiff's argument that the district court misapplied
Rule 56(c)'s summary judgment standard by improperly weighing the evidence, as evidenced by
the court's statements that certain likelihood-of-confusion factors "weighed" in favor of Plaintiff
or "weighed" in favor of Defendants. See Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1237
(11th Cir. 2010) (In reviewing motions for summary judgment, "[n]either we nor the district
court are to undertake credibility determinations or weigh the evidence."). Although likelihood
of confusion is a question of fact, it may be decided as a matter of law. Welding Servs., 509 F.3d
at 1361; Alliance Metals, Inc. v. Hinely Indus., Inc., 222 F.3d 895, 907 (11th Cir. 2000). And
our circuit has routinely "weighed" the likelihood-of-confusion factors on summary judgment.
See, e.g., Welding Servs., 509 F.3d at 1361 (explaining that "[o]verwhelming visual dissimilarity
can defeat an infringement claim, even where the other six factors all weigh in favor of the
plaintiff" and concluding that "[t]he next three factors weigh in favor of Welding Services"
(emphasis added)); Dippin' Dots, Inc. v. Frosty Bites Distrib., LLC, 369 F.3d 1197, 1208 & n.12
(11th Cir. 2004) (holding that no reasonable jury could find that the two logos are confusingly
similar because although "the second factor weighs in favor of FBD," "the remaining six factors
all weigh in favor of DDI," and "the lack of visual similarity between the two designs is
overwhelming" (emphasis added)).
        Plaintiff points to no instance in which the district court improperly weighed conflicting
evidence in assessing the likelihood of confusion between the parties' marks. Rather, it appears
that Plaintiff is arguing that if any one factor suggests that there could be a likelihood of
confusion, summary judgment is improper. This is not the law. The likelihood-of-confusion
multifactor test presupposes that various factors will point in opposing directions. The role of
the court in reviewing a motion for summary judgment is to determine the ultimate question of
whether, in light of the evidence as a whole, there is sufficient proof of a likelihood of confusion
to warrant a trial of the issue. See Welding Servs., 509 F.3d at 1361.

pronunciation, and both parties sell food prepared and served in retail restaurant establishments.[8]  However, both of these factors merely suggest a threshold potential for confusion and are thus entitled to little weight.  An analysis of the remaining factors demonstrates no real likelihood of confusion in the consuming public.

With respect to the strength of Plaintiff's mark (factor one), we conclude that "Dan Tana's" is a relatively weak mark for restaurant services outside of the Los Angeles area.  The weaker the mark, the less likelihood of confusion.  Welding Servs., 509 F.3d at 1361.  As discussed above, determining the strength of a mark requires a consideration of the mark's inherent distinctiveness.  If the mark is merely descriptive, such as a personal or surname, its strength depends on whether it has acquired secondary meaning.  See Perini Corp., 915 F.2d at 125; 815 Tonawanda St. Corp., 842 F.2d at 648; Conagra, 743 F.2d at 1513.  A descriptive mark with secondary meaning is a relatively strong mark.  Dieter v. B & H Indus. of Sw. Fla., Inc., 880 F.2d 322, 329 (11th Cir. 1989).

As a preliminary matter, we do not find persuasive Plaintiff's argument that

---

[8]     Despite Defendants' concession of the similarity of the parties' marks before the district court, they now contest this factor on appeal, arguing that "there are differences in spelling, syllabus, and pronunciation."   This position is inconsistent with that taken by Defendants below, and we decline to entertain it.  In any event, any such differences are negligible.

14

because his mark is derived from his full name, as opposed to his personal or surname, it is an inherently distinctive and, therefore, strong mark. The policy reasons for requiring secondary meaning for the use of a personal or surname as a mark extend equally to the use of full names. See Peaceable Planet, Inc. v. Ty, Inc., 362 F.3d 986, 989–90 (7th Cir. 2004) (identifying the particular reasons for considering names merely descriptive marks: (1) "a reluctance to forbid a person to use his own name in his own business"; (2) a recognition that "some names are so common . . . that consumers will not assume that two products having the same name therefore have the same source"; and (3) the concern that "preventing a person from using his name to denote his business may deprive consumers of useful information"). Although some full names are indeed unique, the majority are shared by numerous individuals across diverse communities and markets. We decline to create a blanket rule distinguishing full names from personal and surnames with respect to the secondary-meaning requirement.

Thus, "Dan Tana's" is merely a descriptive mark, the strength of which is dependent upon the showing of secondary meaning. We consider four factors in assessing secondary meaning: (1) "the length and nature of the name's use," (2) "the nature and extent of advertising and promotion of the name," (3) "the efforts of the proprietor to promote a conscious connection between the name and the

15

business," and (4) "the degree of actual recognition by the public that the name designates the proprietor's product or service." Welding Servs., 509 F.3d at 1358. In light of Plaintiff's continuous use of his mark in the same West Hollywood neighborhood for over four decades, as well as the record evidence of the significant press coverage he receives in Los Angeles publications, it is likely that Dan Tana's has obtained secondary meaning in Los Angeles. However, Dan Tana alleges a likelihood of confusion between his restaurant and an establishment thousands of miles away. Therefore, the relevant inquiry is whether Plaintiff's mark is strong enough outside of Los Angeles to give rise to a likelihood of confusion among consumers of Dantanna's restaurant services in Atlanta. See Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 132 (2d Cir. 2004) ("[T]o achieve the status of a strong mark, plaintiff must demonstrate distinctiveness in the relevant market . . . . In this case, the relevant market is the pool of actual and potential customers of Terrance Brennan's, for it is those patrons whose potential confusion is at issue."). The record fails to establish such widespread secondary meaning.

Plaintiff does not advertise nationally or in the Atlanta area specifically, though he has enjoyed free advertising from articles in national publications such as the New York Times, Forbes Traveler, and USA Today. Although these articles

16

suggest some notoriety among food critics and travel writers of nationwide publications, they do not constitute record evidence of any effort by Plaintiff to "create a conscious connection" in the nationwide public's mind between the name Dan Tana's and his restaurant.  See Welding Servs., 509 F.3d at 1358; see also Brennan's, 360 F.3d at 132 (Articles and reviews discussing Brennan's New Orleans in the context of the City of New Orleans or a trip to New Orleans "in no way demonstrate that potential diners in New York City who find the word Brennan's on a restaurant awning will have any reason to think the restaurant is connected with Brennan's New Orleans, or even will have heard of Brennan's New Orleans.").  Even the use of the name "Dan Tanna" in the television series "Vega$," which aired for a few years in the late 1970s and early 1980s, suggests nothing more than that the name "Dan Tana's" may have a familiar ring to a discrete group of television enthusiasts who viewed the program twenty to thirty years ago, not that present-day patrons of Dantanna's Atlanta would specifically associate the name with Plaintiff's restaurant.

Moreover, the two affidavits submitted by Plaintiff as evidence of the national notoriety of his restaurant—one authored by Plaintiff himself and the other authored by his attorney—make only generalized self-serving statements as to Plaintiff's reputation and add no material evidence to the record that is relevant to

17

the secondary-meaning inquiry. Cf. Conagra, 743 F.2d at 1513–14 (holding

plaintiff had established secondary meaning in its mark because it had

"prominently displayed the Singleton name on virtually all of its seafood products

for over 25 years," distributed promotional films widely, expended over $400,000

annually in worldwide markets on its promotion, and included market surveys in

the record strongly identifying the company name with its products). In sum,

Plaintiff has failed to establish widespread secondary meaning of the name "Dan

Tana's" sufficient to demonstrate that he holds a strong mark in restaurant services

so as to cause a likelihood of confusion among consumers in Atlanta.[9] In light of

the weakness of Plaintiff's mark in the context of this infringement suit (factor

one), the conceded similarity between the two marks (factor two) adds little weight

to Plaintiff's effort to show likelihood of confusion.

---

[9]    We also dismiss Plaintiff's attempt to circumvent the relevance of secondary meaning by arguing that his complaint alleges both trademark infringement and false endorsement, and that no secondary meaning is required to establish trademark rights in false endorsement cases. In support of this argument, Plaintiff relies on a Ninth Circuit case, Downing v. Abercrombie & Fitch, 265 F.3d 994 (9th Cir. 2001), which sets forth a distinct set of factors for evaluating "celebrity cases" of false endorsement in that circuit. Not only has our circuit never endorsed the Ninth Circuit's Downing factors, but we have also never recognized a separate claim of false endorsement, distinct from trademark infringement under § 43(a) and exempt from our secondary-meaning inquiry. Moreover, a reading of Downing reveals that secondary meaning is indeed relevant to the Ninth Circuit's likelihood-of-confusion inquiry in celebrity cases. See id. at 1007 (listing as the first likelihood-of-confusion factor "the level of recognition that the plaintiff has among the segment of the society for whom the defendant's product is intended"). In any event, in light of Plaintiff's complaint, which alleges only one Lanham Act count—a classic claim of false designation of origin under § 43(a)—this argument has no basis in the pleadings.

18

A comparison of the goods and services offered under the parties' marks (factor three) reveals overwhelming evidence that consumers would be unlikely to confuse the two restaurants. The goods and services provided in the parties' restaurants are strikingly dissimilar, and the record belies Plaintiff's assertion that Dantanna's in Atlanta provides "nearly identical" cuisine and ambiance to his Hollywood restaurant. In fact, the only apparent commonality between the two restaurants is that they are both fine-dining establishments serving meat and fish. Dan Tana's is an old-world-style Italian restaurant where mustached waiters dressed in tuxedos serve classic Italian dishes off a menu embellished with Italian language. The ambiance is cozy, intimate, romantic, low-lit, and the restaurant caters to Hollywood's elite and to celebrities seeking a safe haven from paparazzi. In stark contrast, Dantanna's in Atlanta is an upscale sports restaurant, targeting sports enthusiasts and serving contemporary American cuisine in a modern setting decorated with flat-screen televisions. Cf. Coach House Rest., 934 F.2d at 1562 (finding that "the registrant's restaurant was modeled to emulate the same ambiance and provide the same cuisine" as plaintiff's restaurant, which contributed to the court's finding of a material issue of fact on the likelihood of confusion between the two marks).

The stark differences between the parties' restaurants, described in the

19

preceding paragraph, also demonstrate that their customers are dissimilar, which is an aspect of the similarity of the parties' actual sales methods (factor four). The district court accepted Defendants' concession that the two parties have identical sales outlets (the other consideration in evaluating the similarity of sales methods), in that they both serve food in retail restaurant establishments, but did not compare the restaurants' customer base. Thus, viewing factor four in its entirety, it adds little weight to the possibility of a likelihood of confusion.

Additionally, Plaintiff and Defendants do not engage in similar methods of advertising (factor five). Plaintiff admittedly relies solely on free publicity to advertise his restaurant, aside from maintaining a website. Defendants, by contrast, both maintain a website and purchase advertising at sporting events and in various local and national publications. Thus, the only similarity in the advertising channels used by the two parties is their maintenance of websites on the World Wide Web. This similarity would dispel rather than cause confusion, however, because the websites are separate and distinct, suggesting two completely unrelated business entities.

There is also scant evidence of any intention of Defendants to misappropriate Plaintiff's mark (factor six). Plaintiff asserts, in a rather conclusory fashion, that Defendants knew of the Dan Tana's restaurant prior to adopting the name

20

"Dantanna's" for their own because Clapp previously lived in Los Angeles and worked in the restaurant business there. Although this fact gives rise to an inference that Clapp could have encountered the Dan Tana's restaurant during his time in California, it does not contradict Defendants' evidence of an independent and innocent origin of the Dantanna's mark: that the name "Dantanna's" was derived from the names of Clapp's two children, Daniel and Anna by shortening Daniel to "Dan" and connecting the two names with a "+" sign, which was eventually converted into a "t." Moreover, Clapp testified in his deposition that he did not learn of Plaintiff's restaurant until sometime in 2003, after he had already selected the name of his restaurant and begun the trademark registration process. Aside from Plaintiff's bald assertion that Clapp fabricated this story, the affidavit and his testimony remain uncontroverted by any material evidence. In fact, Plaintiff testified in his deposition before the PTO that he had no reason to believe that Clapp's story was not true. Where a story of the creation of a mark is undisputed and shows an innocent origin, we have concluded that there is no intent of misappropriation contributing to a likelihood of confusion. See Welding Servs., 509 F.3d at 1361.

Additionally, and perhaps most significantly, Plaintiff is unable to identify any credible motive for Defendants to trade on the name of his restaurant in

21

Atlanta. There is no evidence of any secondary meaning associated with Plaintiff's mark in the Atlanta area; there is no competition between the two restaurants; and the restaurants fulfill entirely different niches in the food services market. Finally, a factfinder is less likely to find intentional infringement where a defendant uses his own name in creating his mark. See Conagra, 743 F.2d at 1515 n.9. Although the record indicates that Clapp used his children's as opposed to his own name for his restaurant, the source of the name is personal and familial and further support for our conclusion that no reasonable jury could find intentional infringement on these facts.

The last factor, actual confusion in the consuming public, is the most persuasive evidence in assessing likelihood of confusion. Alliance Metals, Inc. v. Hinely Indus., Inc., 222 F.3d 895, 907 (11th Cir. 2000). Again, Plaintiff's evidence is nominal. In fact, the only evidence adduced by Plaintiff as to actual confusion was an affidavit by Kenneth McGuire, a Los Angeles resident and patron of Dan Tana's Hollywood, who claimed that he chose to patronize Dantanna's on a visit to Atlanta because of the similarity of the two restaurants' names, which led him to believe they had an affiliation. McGuire attested that upon entry he was struck by "the signage and the decor in the Atlanta's Dantanna's," which "was so close to the decor as the Dan Tana's in Hollywood" that it strengthened his belief of the

22

restaurants' association. The district court concluded that the McGuire affidavit was simply not credible in light of the record evidence of the striking dissimilarities between the restaurants' interiors, menus, and ambiance and was therefore entitled to little weight. See 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2727 (3d ed. 2008) (Under Federal Rule of Civil Procedure 56, "the court may disregard an offer of evidence that is too incredible to be believed."). Even if we declined to completely disregard the affidavit, this evidence of actual confusion is so minimal as to be practically insignificant.

The only other evidence of actual confusion is Defendants' admission that there have been two incidents in which customers have inquired as to the restaurants' possible affiliation with Dan Tana's Hollywood since Dantanna's opened in 2003. This evidence of actual confusion is also weak; in considering actual confusion we look not only to the existence but also to the extent of such confusion. Welding Servs., 509 F.3d at 1360. Dantanna's has served over one million customers in the five years between its opening and the filing of this lawsuit; no reasonable jury would conclude that an inquiry by only two customers of a possible connection between the restaurants demonstrates actual confusion in the consuming public. Our cases finding relevant actual confusion have concerned

23

much more significant evidence.  Cf. Alliance Metals, 222 F.3d at 908 (finding

"ample undisputed evidence" of actual confusion where plaintiff attached copies of

more than a dozen checks plaintiff received from customers for goods bought from

defendants and seven invoices from vendors billing plaintiff under a confusing

combination of plaintiff's and defendant's names); Conagra, 743 F.2d at 1515

(finding relevant actual confusion where the evidence demonstrated "numerous"

instances where people assumed an affiliation between the parties' businesses,

including inquiries by distributors to plaintiff about services provided by

defendant).

ii.     The Relevance of Geographic Proximity of Use

We also reject Plaintiff's argument that the district court erred as a matter of

law in considering the geographic proximity of the use of the parties' marks.  Our

circuit has recognized that "new factors may merit consideration" in determining

whether there is a likelihood of confusion.  Swatch Watch, S.A. v. Taxor, Inc., 785

F.2d 956, 958 (11th Cir. 1986).  And our case law already establishes that

geographic considerations may be relevant to the likelihood-of-confusion analysis,

even where we have not articulated this consideration as a separate factor.  See,

e.g., St. Luke's Cataract & Laser Inst., P.A. v. Sanderson, 573 F.3d 1186, 1209

(11th Cir. 2009) (considering the fact that the two companies worked in "the same

24

geographical market" in holding that there was a clear likelihood of confusion of the parties' service marks to sustain the jury verdict); Alliance Metals, 222 F.3d at 908 (considering the undisputed evidence that both companies distributed prefinished aluminum sheets and sign blanks in the "same territory" in concluding that there was a likelihood of confusion).

We have already discussed the relevance of geography in our evaluation of the strength of Plaintiff's mark under the first factor of our existing seven-factor likelihood-of-confusion test. Where the secondary meaning acquired by a descriptive mark dictates its strength and distinctiveness, as here, the geographic remoteness of a mark's use may be relevant to the likelihood-of-confusion inquiry. Because Plaintiff seeks to establish a likelihood of confusion with a restaurant in Atlanta, the geographically remote use of his mark in West Hollywood weighs against a finding of nationwide secondary meaning, leaving him with only a weak mark unlikely to cause a likelihood of confusion in Atlanta.

Geographic considerations are also particularly relevant where a plaintiff holds only common-law trademark rights in a mark because it is well-established that the scope of protection accorded his mark is coextensive only with the territory throughout which it is known and from which it has drawn its trade. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 416, 36 S. Ct. 357, 361 (1916), superseded

25

by statute in irrelevant part as stated in Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 105 S. Ct. 658 (1985). The owner of a registered mark, in contrast, enjoys the unlimited right to use the mark nationwide, and federal registration affords the registrant priority over all future users of confusingly similar marks. 15 U.S.C. § 1057(c); Coach House Rest., 934 F.2d at 1564. Therefore, a Lanham Act plaintiff asserting common-law trademark rights under § 43(a) against the owner of a registered mark, as here, bears the burden of establishing the right to use its mark by actual use in a given territory. Emergency One, Inc. v. Am. Fire Eagle Engine Co., 332 F.3d 264, 269 (4th Cir. 2003). And because registration constitutes constructive nationwide notice of the registrant's priority of use of a mark, 15 U.S.C. § 1072, only actual use occurring prior to such registration gives rise to enforceable common-law trademark rights, 15 U.S.C. § 1065. Thus, federal registration has the practical effect of freezing a prior user's enforceable trademark rights thereby terminating any right to future expansion beyond the user's existing territory. Allard Enters., Inc. v. Advanced Programming Res., Inc., 249 F.3d 564, 572 (6th Cir. 2001) ("In the case in which a junior user applies for registration, . . . the extent of the senior user/non-registrant's territory is frozen as of the date of

26

actual registration to the junior user.").[10]

Accordingly, because Plaintiff continued to operate only a single location of Dan Tana's at the time Defendants registered their mark, his trademark rights in the "Dan Tana's" name are limited to the Los Angeles market. Furthermore, the record also establishes that Defendants currently operate restaurants only in the Atlanta area and that the mark of neither party is known by the customers in the other's market. Thus, at present, the parties' restaurants coexist in remote markets, geographically and otherwise. On such a record, geographic considerations are indeed relevant and demonstrate a smaller likelihood of confusion. See Coach House Rest., 934 F.2d at 1564–65 (explaining that in an action for trademark

_____

[10] See also Peaches Ent. Corp. v. Ent. Repertoire Assocs., Inc., 62 F.3d 690, 693 (5th Cir. 1995); Thrifty Rent-A-Car Sys., Inc. v. Thrift Cars, Inc., 831 F.2d 1177, 1181 (1st Cir. 1987) (applying the same principle to the related context in which the senior user obtains registration and yet the junior user established market penetration in a discrete area prior to such registration). For this reason, it is irrelevant to our likelihood-of-confusion analysis that Plaintiff testified in this lawsuit (and after Defendants' registration) about an intent to expand his restaurant into other markets in other parts of the country. Moreover, even if Defendants did not enjoy the benefit of a federal registration, the record contains no evidence demonstrating that Atlanta, Georgia, would be considered within Plaintiff's "zone of natural expansion." See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1027–28 (11th Cir. 1989) (explaining the common-law expansion doctrine, which provides a senior user with "some limited 'breathing space' in which to expand beyond its current actual use" based on the nature of the senior user's use at the time of the junior user's first use). A senior user that has constantly expanded its business prior to the junior user's adoption of the mark may be entitled to exclusive rights in a zone of natural expansion, even if that zone ousts a junior user from its current territory. Id. (citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 26:8 (2d ed. 1984)). However, where a "senior user is static, and has restricted use to only one small area, such as one city, a good-faith junior user may expand into a nationwide use of the mark, subject only to an exception in the small area occupied by the senior user." Id. at 1028 (citing McCarthy, supra, at § 26:8).

27

infringement, as opposed to a cancellation proceeding, brought by a prior user of an unregistered mark, there is no presumption that the mark is being used nationwide, and therefore where the two parties "operate in discrete, remote areas, there is a smaller likelihood that there will be confusion"); Brennan's, 360 F.3d at 134 ("In the restaurant industry, especially where individual restaurants rather than chains are competing, physical separation seems particularly significant to the inquiry into consumer confusion."). We therefore hold that the geographic remoteness of the parties' restaurants is particularly relevant to our likelihood-of-confusion analysis where a plaintiff bases a trademark infringement claim on common-law trademark rights. The district court did not err in considering the geographic proximity of use as an eighth factor demonstrating the unlikelihood of confusion.[11]

---

[11] We decline to consider Plaintiff's argument that the underlying action is a cancellation proceeding rather than a trademark infringement action, so as to make geographic proximity of use irrelevant to the likelihood-of-confusion inquiry. See Coach House Rest., 934 F.2d at 1564 (explaining that where a prior user seeks to cancel a registrant's mark, there is a presumption that the registered mark is being used nationwide, i.e., it is already encroaching upon the prior user's market—wherever that may be—and therefore "geographical remoteness is irrelevant to this likelihood of confusion inquiry"). The district court squarely held in its order granting Defendants summary judgment: "This is not . . . a cancellation proceeding." And our review of Plaintiff's brief to the district court persuades us that the district court was warranted in treating this case only as an infringement action. Plaintiff failed to present his case to the district court as a cancellation proceeding; Plaintiff only argued that he was "seeking" to cancel Defendants' mark pursuant to 15 U.S.C. § 1119, not that this prayer for relief transformed his § 43(a) trademark infringement action into a cancellation proceeding.

Notwithstanding the district court's clear characterization of this suit as a trademark infringement action, and resolution thereof as a § 43(a) infringement claim, Plaintiff's briefs on appeal fail to fairly raise this issue for our review, which is a necessary predicate to Plaintiff's invocation of Coach House. "Under our case law, a party seeking to raise a claim or issue on

Viewing the likelihood-of-confusion factors as a whole, there is minimal evidence of a likelihood of confusion between Plaintiff's and Defendants' restaurants aside from the initial similarity of their names and the fact that they both provide restaurant services. The remaining factors all weigh against a likelihood of confusion, some overwhelmingly so. There are stark differences between the two restaurants' cuisine and ambiance. There is virtually no evidence of confusion in advertising channels. No reasonable jury could find that Defendants intended to trade on Plaintiff's mark, and there is negligible evidence of any actual confusion between the two restaurants. Moreover, in light of the vast geographical distance between the two markets currently used by the parties, a

appeal must plainly and prominently so indicate. Otherwise, the issue . . . will be considered abandoned." United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).

Plaintiff did not include the issue of the district court's mischaracterization of his suit in his statement of the issues; he does not discuss it in his summary of the argument; and he does not list it in his table of contents. In fact, he failed to even include a table of contents. His standard-of-review section does not list the standard for reviewing questions of law, such as this one. Nowhere in his brief, or in his submissions to the district court, does he even list the elements of a claim for cancellation. Most importantly, Plaintiff failed to argue how his complaint sufficiently alleged such a claim under federal notice pleading standards, failed to elucidate the relationship between a trademark infringement action and a cancellation proceeding, and failed to provide support for the proposition that merely praying for cancellation as a remedy for infringement is sufficient to convert an infringement action into a cancellation action or a dual infringement and cancellation action.

Plaintiff's only argument on appeal with respect to the district court's characterization of his suit as one for trademark infringement, as opposed to cancellation, appears in the context of his discussion of the relevance of geographic proximity of use in a trademark infringement action. Because Plaintiff proceeds throughout his appeal as if this action is one for trademark infringement under § 43(a) of the Lanham Act and has failed to "plainly and prominently" indicate his intent to appeal to our court to correct any mischaracterization of his suit by the district court, we deem this argument abandoned.

29

likelihood of confusion is highly unlikely.  In sum, Plaintiff has failed to adduce sufficient evidence upon which a reasonable jury could find a likelihood of confusion between Plaintiff's and Defendants' marks.  Accordingly, we affirm the district court's grant of summary judgment to Defendants on Plaintiff's Lanham Act count.

Because neither party contests the district court's conclusion that the elements to establish deceptive trade practices under Georgia's Uniform Deceptive Trade Practices Act and fraud under O.C.G.A. § 23-2-55 are identical to those required to prevail on Plaintiff's federal infringement claim, we also affirm the district court's grant of summary judgment on these state law claims.  See Jellibeans, 716 F.2d at 839.

B.  Appropriation of Likeness

We now turn to Plaintiff's second issue on appeal:  that the district court erred in granting summary judgment on his appropriation-of-likeness tort claim. To prove an appropriation of likeness under Georgia law, a plaintiff must establish that the defendant invaded his privacy by appropriating, for the defendant's benefit, use or advantage, the plaintiff's name or likeness.  Cabaniss v. Hipsley, 151 S.E.2d 496, 500 (Ga. Ct. App. 1966).  Plaintiff asserts on appeal that an appropriation of likeness need not be intentional to be an actionable invasion of privacy.  This

30

position is wholly without merit.

An appropriation of likeness without an intent to use the likeness for one's benefit fails to meet the very definition of the tort itself. Furthermore, Georgia case law plainly establishes that summary judgment is proper where a plaintiff fails to show an intentional or knowing appropriation of likeness. Blakey v. Victory Equip. Sales, Inc., 576 S.E.2d 288, 292 (Ga. Ct. App. 2002) (holding that the district court properly awarded summary judgment to defendant on plaintiff's appropriation-of-likeness claim for the sole reason that "[t]here [was] no evidence . . . that defendants ever knowingly took Blakely's identity for their purposes").

As discussed in Part II.A., Plaintiff also fails to present any material evidence that calls into question the truthfulness of Clapp's claim of origin for his restaurant's name aside from the general assertion that Clapp's experience working in Los Angeles may have resulted in his knowledge of the "Dan Tana's" restaurant. Without any evidence to contradict Clapp's account that his restaurant is named after his own two children, as opposed to Plaintiff's restaurant in Hollywood, and without any evidence of a motive for Defendants to trade on the name of Plaintiff's restaurant, there can be no intentional appropriation of Plaintiff's name or likeness. In sum, the district court did not err in granting summary judgment to Defendants on Plaintiff's appropriation-of-likeness claim.

31

CONCLUSION

Because Plaintiff failed to produce sufficient evidence raising a genuine issue of material fact on the likelihood of confusion between Plaintiff's and Defendants' marks, the district court did not err in granting summary judgment to Defendants on Plaintiff's federal and state trademark infringement claims and his claim of fraud arising under Georgia law. We also uphold the district court's grant of summary judgment to Defendants on Plaintiff's appropriation-of-likeness claim due to the absence of any evidence of an intentional appropriation of Plaintiff's likeness.

AFFIRMED.