[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13178
_____

D.C. Docket No. 0:12-cv-61853-WPD


PAUL B. TARTELL, M.D.,

Plaintiff-Appellee,

versus

SOUTH FLORIDA SINUS AND ALLERGY CENTER, INC.,
LEE M. MANDEL, M.D., INC.,
a Florida Corporation,
LEE M. MANDEL, M.D.,
Individually,

Defendants-Appellants.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 23, 2015)

Before WILLIAM PRYOR, JULIE CARNES, and SILER,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

_____

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

This appeal requires us to decide whether the district court clearly erred when it found that a physician's name had acquired "secondary meaning," *Tana v. Dantanna's*, 611 F.3d 767, 774 (11th Cir. 2010) (internal quotation marks omitted). Dr. Paul B. Tartell and Dr. Lee M. Mandel jointly practiced medicine in South Florida until 2011. After they split their practices, Dr. Mandel registered six domain names with variations of Dr. Tartell's name. Dr. Tartell then filed a complaint against Dr. Mandel, his incorporated practice, and another corporation owned by Dr. Mandel for cybersquatting, 15 U.S.C. § 1125(d), false designation of origin, *id.* § 1125(a), and unfair competition. Dr. Mandel canceled the registration for the domain names the day after Dr. Tartell filed his complaint, but the parties persisted in this litigation. At a bench trial, Dr. Tartell presented evidence that his name had appeared on several advertisements for their joint practice, but Dr. Tartell presented no substantial evidence about the effect of those advertisements on consumers. The district court ruled that Dr. Tartell's name had acquired secondary meaning, but awarded him only statutory damages for cybersquatting in the absence of any evidence of actual damages. Because Dr. Tartell failed to present substantial evidence that his name had acquired secondary meaning in the minds of consumers, the district court clearly erred. We reverse and render a judgment in favor of Dr. Mandel and his corporations.

2

## I. BACKGROUND

From 1998 to 2011, Dr. Tartell and Dr. Mandel practiced together as part of Tartell & Mandel, M.D., LLC., under the name South Florida Sinus and Allergy Center. In February 2011, the doctors split their practices, and the split was contentious.

After the split of their practices, Dr. Mandel incorporated the name of their practice, South Florida Sinus and Allergy Center, Inc., without Dr. Tartell's knowledge, and Dr. Mandel registered six domain names that used some variation of Dr. Tartell's name: ptartell.com, paultartellmd.net, paultartellmd.com, paultartell.net, paultartell.com, and tartell.net. Dr. Mandel configured five of the domain names to forward users to sfsac.com, a domain name he controlled. Dr. Mandel also purchased Google AdWords for "Paul Tartell" and "Paul Tartell, MD," which caused sfsac.com to appear as an advertisement whenever someone searched with those terms on Google.

After Dr. Tartell discovered the registered domain names, he filed a complaint against Dr. Mandel; Dr. Mandel's professional corporation, Lee M. Mandel, M.D., Inc.; and South Florida Sinus and Allergy Center, Inc. Dr. Tartell asserted five causes action: federal cybersquatting, 15 U.S.C. § 1125(d); false designation of origin, *id.* § 1125(a); unfair competition; false advertising, *id.* § 1125(a); and unauthorized publication of name and likeness, Fla. Stat. § 540.08.

3

Dr. Mandel cancelled the domain names the day after Dr. Tartell filed his complaint. But as the district court aptly described, "this action continued all the way through [a four-day bench] trial because Dr. Mandel refused to take responsibility for his antics while Dr. Tartell sought a statutory windfall for a short-lived and largely pointless deceit."

To prove that his name had acquired "secondary meaning," *Tana*, 611 F.3d at 774 (internal quotation marks omitted), Dr. Tartell presented evidence of his academic and community activities, evidence of commercial advertisements of his practice with Dr. Mandel, and testimony about patient and doctor recognition of his name. For example, Dr. Tartell presented evidence that he gave 39 lectures from 1990 to 1997 and 11 presentations from 1988 to 1995 and that he published ten articles in medical journals between 1989 and 1999. Dr. Tartell also testified that he gave "[d]ozens" of non-academic lectures to various groups with "50 or so" people and that he participated in charitable organizations. But Dr. Tartell provided no details about his non-academic lectures. Dr. Tartell also presented evidence that his name appeared on a variety of promotional materials, including several advertisements for the Center that appeared at the Bank Atlantic Center, where the Florida Panthers play professional hockey; advertisements for the Center that appeared on concession items at the Arena; a biography of Dr. Tartell that appeared in the program and on the website for the Panthers; advertisements for

4

the Center in the Sun Sentinel newspaper and on the radio; and listings of Dr. Tartell's name in directories for patients and medical professionals. Dr. Tartell testified that, "not infrequent[ly]," patients "come to [him] saying that the reason they're coming to [him] . . . is because they searched [him], and they found . . . article[s] that [he] had written" and that "everybody that [went to the Bank Atlantic Center] knew that [he was] the voice doctor[]." He testified that his academic activities caused other doctors to contact him with questions or to refer patients to him. And two referring doctors testified that other doctors "thought very highly of" Dr. Tartell, that their patients were usually "happy with the results" when referred to Dr. Tartell, and that other doctors gave "the utmost praise" when talking about Dr. Tartell.

The district court found that "Dr. Tartell's name has acquired secondary meaning within South Florida" based on "the length and prevalence of Dr. Tartell's overall public use of his name in conjunction with his medical services—including his widespread advertisements through affiliation with the Florida Panthers." The district court mentioned the evidence submitted by Dr. Tartell, but it made no specific findings with respect to each of the four factors that courts should consider when determining whether a mark has acquired secondary meaning, *see id.* at 776.

The district court entered a judgment in favor of Dr. Tartell for cybersquatting, false designation, unfair competition, and unauthorized publication

of name and likeness, but against his claim for false advertising. The district court awarded Dr. Tartell $1,000 in statutory damages for each claim for cybersquatting, for a total of $6,000, but it awarded Dr. Tartell no other relief because he failed to prove actual damages. The district court later ruled that Mandel, Inc., and South Florida Sinus and Allergy Center, Inc., were liable to the same extent that Dr. Mandel was liable.

## II. STANDARDS OF REVIEW

"After a bench trial, we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009). "The existence of secondary meaning is a question of fact," which we review "under the clearly erroneous standard." *Am. Television & Commc'ns Corp. v. Am. Commc'ns & Television, Inc.*, 810 F.2d 1546, 1549 (11th Cir. 1987). A factual finding is clearly erroneous "if, after viewing all the evidence, we are left with the definite and firm conviction that a mistake has been committed." *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 873 (11th Cir. 2005) (internal quotation marks and citation omitted).

## III. DISCUSSION

A plaintiff must prove that his service mark is "distinctive" to establish a claim for cybersquatting, 15 U.S.C. § 1125(d)(1)(A)(ii)(I), for false designation of origin, *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512–13 (11th Cir. 1984), and

6

for unfair competition, *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 652 (11th Cir. 2007). We "recognize[] four categories of distinctiveness" for marks, but the parties agree that Dr. Tartell's name is a "descriptive" mark, which is a "mark[] that identif[ies] the characteristic or quality of a product or service." *Tana*, 611 F.3d at 774. Although a descriptive mark is not "inherently distinctive," it "may become sufficiently distinctive to enjoy trademark protection by acquiring 'secondary meaning.'" *Id.*

"A name has acquired secondary meaning when the primary significance of the term in the minds of the consuming public is not the product but the producer." *Id.* (quoting *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007)). In other words, secondary meaning requires that a "name denotes to the consumer or purchaser 'a single thing coming from a single source.'" *Am. Television*, 810 F.2d at 1549 (quoting *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 12 (5th Cir. 1974)). A plaintiff may prove secondary meaning with direct evidence, such as consumer surveys, or circumstantial evidence. *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1525 (11th Cir. 1991). A court should consider the four *Conagra* factors to determine if circumstantial evidence establishes that a mark has acquired secondary meaning:

> (1) the length and nature of the name's use, (2) the nature and extent
> of advertising and promotion of the name, (3) the efforts of the

7

proprietor to promote a conscious connection between the name and the business, and (4) the degree of actual recognition by the public that the name designates the proprietor's product or service.

*Tana*, 611 F.3d at 776 (internal quotation marks and citation omitted). The "minds of the consuming public," *id.* at 774 (internal quotation marks and citation omitted), define what, if any, secondary meaning is attributed to a mark, and as such, the owner of a mark must adduce evidence of what "the [mark] denotes to the consumer," *Am. Television*, 810 F.2d at 1549.

The district court clearly erred when it found that Dr. Tartell's name had acquired secondary meaning. Because Dr. Tartell offered no consumer surveys, he had to rely on circumstantial evidence to prove that his name had acquired secondary meaning. Although Dr. Tartell produced some evidence relevant to the *Conagra* factors, he failed to produce any substantial evidence of what his name "denotes to the consumer," *id.* As a result, "we are left with the definite and firm conviction that a mistake has been committed," *HGI Assocs.*, 427 F.3d at 873 (internal quotation marks and citation omitted).

As a threshold matter, Dr. Tartell's evidence about the use of his name in academic settings and evidence about his reputation among other medical professionals are not probative of whether his name had acquired secondary meaning. The target audience for Dr. Tartell's academic activities, most of which occurred more than two decades ago, was not consumers of his medical services—

8

that is, potential patients. And nothing in the record suggests that, "present-day [potential patients] would specifically associate [his] name with [his services]," *Tana*, 611 F.3d at 777, based on his academic activities. *See also Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 20–21 (1st Cir. 2004) (holding that academic activities are not evidence of secondary meaning where "consumers [are not] aware of [the] academic achievements"). Likewise, evidence that Dr. Tartell is respected by his peers "suggests nothing more than that [his] name . . . may have a familiar ring to a discrete group," *Tana*, 611 F.3d at 777.

Dr. Tartell produced no substantial evidence relevant to the fourth *Conagra* factor, "the degree of actual recognition by the public," *id.* at 776 (internal quotation marks and citation omitted), which bears directly on what his name "denotes to the consumer," *Am. Television*, 810 F.2d at 1549. The only evidence related to this factor was Dr. Tartell's self-serving testimony that some patients told him that they selected him because of his articles and that "everybody that [went to the Bank Atlantic Center] knew that [he was] the voice doctor[]." But Dr. Tartell's "generalized self-serving statements as to [his] reputation . . . add no material evidence . . . that is relevant to the secondary-meaning inquiry," *Tana*, 611 F.3d at 777; s*ee also Flynn*, 377 F.3d at 21 (explaining that a plaintiff's testimony "that a handful of strangers have told her that they recognized her from a

9

talk or that they had read her [work]" is "limited anecdotal evidence [that] does little to establish that her name has acquired secondary meaning").

Dr. Tartell's remaining evidence says nothing about the perceptions of consumers. For example, "there is nothing significant about the manner of [Dr. Tartell]'s use of" his name, *Investacorp*, 931 F.2d at 1525. Dr. Tartell practiced under the name "South Florida Sinus and Allergy Center" for most of the 13 years before this action, so Dr. Tartell's name was not the primary mark by which his services were identified during this period. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7.3 (4th ed. 2009) ("[T]he prominence of a word or symbol is certainly an important element in determining whether it creates a separate commercial impression on the average buyer."). Dr. Tartell produced no evidence that his use of his name was unique as compared to how another doctor would use his name. *See id.* § 13.2 (explaining that, in "professions where the use of personal names as identifiers is traditional," such as the medical profession, it is more difficult to establish secondary meaning). And, "the nature and extent of advertising," *Tana*, 611 F.3d at 776 (internal quotation marks and citation omitted), of Dr. Tartell's name fails to establish that his name had acquired secondary meaning. Although Dr. Tartell's name appeared on numerous advertisements and other promotional material, his name was not displayed "prominently." *See Conagra*, 743 F.2d at 1513 (stating that the "prominen[ce]" of a name on

10

packaging may support a finding of secondary meaning). All of the advertisements instead displayed the name of the Center or its logo more prominently. "South Florida Sinus and Allergy Center" was written in larger font, and the visual features of each advertisement drew the reader's attention to that mark. Dr. Tartell's name appeared in smaller font, near the bottom of the advertisements, alongside Dr. Mandel's and a physician assistant's names. These advertisements fail to suggest that 'a single thing[, sinus and allergy services at the Center,] com[es] from a single source[, Dr. Tartell],'" *Am. Television*, 810 F.2d at 1549 (internal quotation marks and citation omitted). Dr. Tartell also failed to present any evidence about his "efforts . . . to promote a conscious connection between [his] name and [his services]," *Tana*, 611 F.3d at 776 (internal quotation marks and citation omitted). Dr. Tartell testified that he chose the content of the advertisements to create a connection between sinus and allergy services and his name, but those advertisements prominently featured the name of the Center, not Dr. Tartell's name. Although Dr. Tartell also mentioned various lectures he gave in the community, his "generalized self-serving statements," *id.* at 777, failed to provide any details about these lectures. Moreover, "[d]ozens" of lectures to "50 or so" people cannot establish that his name had acquired a secondary meaning with a significant portion of potential patients in densely populated South Florida. Dr.

11

Tartell presented no evidence that "advertising campaigns made major inroads to the consumer psyche." *Investacorp*, 931 F.2d at 1526.

## IV. CONCLUSION

We **REVERSE** the judgment in favor of Dr. Tartell and **RENDER** a judgment in favor of Dr. Mandel and his corporations.