[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-13830

_____

D.C. Docket No. 1:14-cv-02288-TWT

SAVANNAH COLLEGE OF ART AND DESIGN, INC.,

Plaintiff - Appellant,

versus

SPORTSWEAR, INC.,
d.b.a. Prep Sportswear,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 3, 2017)

Before MARTIN and JORDAN, Circuit Judges, and COOGLER,[*] District Judge.

_____

[*] The Honorable L. Scott Coogler, United States District Judge for the Northern District
of Alabama, sitting by designation.

JORDAN, Circuit Judge:

"Imitation may be the sincerest form of flattery," Charles C. Colton, Lacon, Vol. 1, No. 183 (1820–22), in Bartlett's Familiar Quotations 393:5 (16th ed. 1992), but when the imitation consists of commercial reproduction for profit, all bets are off. So when Sportswear, Inc. began using the federally-registered service marks of the Savannah College of Art and Design without a license to sell apparel and other goods on its website, SCAD did not take kindly to the copying and sued for equitable and monetary relief. SCAD asserted a number of claims against Sportswear, including service mark infringement under 15 U.S.C. § 1114; unfair competition and false designation of origin under 15 U.S.C. § 1125; and unfair competition under O.C.G.A. § 10-1-372.

This is SCAD's appeal from the district court's grant of summary judgment in favor of Sportswear. The district court, relying on *Crystal Entertainment & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1315–16 (11th Cir. 2011)—a case involving a dispute over common-law trademark rights to a band name— concluded that SCAD had failed to establish that it had enforceable rights in its marks that extended to apparel. SCAD, which validly registered its marks only in connection with the provision of "education services," did not show that it had used its marks on apparel earlier than Sportswear in order to claim common-law

2

ownership (and priority) over its marks for "goods." *See Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 2015 WL 4626911, at *2 (N.D. Ga. 2015).

We reverse. This case, unlike *Jurado*, does not involve the alleged infringement of a common-law trademark, and as a result the date of SCAD's first use of its marks on goods is not determinative. One of our older trademark cases, *Boston Prof'l Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004 (5th Cir. 1975), controls, as it extends protection for federally-registered service marks to goods. Although *Boston Hockey* does not explain how or why this is so, it constitutes binding precedent that we are bound to follow.

# I[1]

Founded in 1978, SCAD is a private, non-profit college based in Georgia, and provides educational services to over 11,000 students from across the United States and more than 100 countries. SCAD is primarily known for specialized programs related to the arts, such as painting, sculpture, architecture, fashion, photography, film, and design. In addition to providing educational programs, SCAD fields athletic teams in a variety of sports.

To distinguish itself in the market and promote its programs and services, SCAD holds four federally-registered marks:

---

[1] Judge Martin joins all except Part IV.C of the opinion.

3

SCAD    SAVANNAH COLLEGE OF ART AND DESIGN

The federal registrations for these marks were issued for "education services," i.e., the provision of "instruction and training at the undergraduate, graduate, and post-graduate levels." *See, e.g.,* D.E. 1-1, 1-2. And the parties agree that SCAD has continuously used its marks for the promotion of its "education services."[2]

SCAD has used the two word marks at issue here—"SCAD" (registered in 2003) and "SAVANNAH COLLEGE OF ART AND DESIGN" (registered in 2005)—since 1979, and they have now achieved incontestable status. In general, this means that SCAD has filed the requisite affidavit of use and incontestability under 15 U.S.C. § 1065(3), and that the U.S. Patent and Trademark Office has

---

[2] SCAD may have been able to secure federal trademark registrations for the use of its word marks on goods such as apparel, but apparently did not attempt to do so. "There is no doubt that a given symbol can be used in such a way that it functions as both a trademark for goods and a service mark for services, and be the subject of separate registrations." 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:84 (4th ed. June 2017). *See also id.* at § 19:87 ("If a service company (or a producer of goods) puts its mark on promotional items to be used by recipients, such as ball point pens and wearing apparel, the mark can be registered for such goods."); *Hans C. Bick, Inc. v. Watson*, 253 F.2d 344, 344 (D.C. Cir. 1958) (discussing registrations for the word "Nylonized" as a trademark for women's nylon hosiery and as a service mark for the application of a nylon coat); *In re McDonald's Corp.*, 199 U.S.P.Q. 921, 1978 WL 21263, at *3 (T.T.A.B. 1978) (registering "McDonald's" and "golden arches" marks for clothing because they "indicat[e] the source of origin of the various items of apparel in [the] applicant [McDonald's Corporation]").

4

acknowledged that these two marks have been validly registered and in continuous use for at least five years. *See* D.E. 49-3 at 5, 10, 15, 24.

Sportswear operates entirely online and uses an interactive website to market and sell "fan" clothing and items like t-shirts, sweatshirts, baseball caps, and duffel bags. Sportswear began selling apparel for K-12 schools in 2003, and it now offers made-to-order apparel and related goods for other entities, including colleges, Greek and military organizations, golf courses, professional sports teams, and even fantasy sports teams with—and without—licensing agreements. To purchase an item from Sportswear, a customer is generally required to select its preferred organization's "online store," choose an item like a t-shirt or hat, and select that organization's emblem, mascot, or name. Sportswear's website then generates a sample of the selection, prompts the customer to checkout online, and ships the final product to the customer's home in a package indicating that it was delivered from a Sportswear facility.

In February of 2014, a parent of a student-athlete forwarded Sportswear's website to one of SCAD's coaches. As a result, SCAD learned that Sportswear had been using its word marks on products without authorization (and without a licensing agreement) since August of 2009. Seeking to protect its marks from further unauthorized use, SCAD sued Sportswear in July of 2014. At that point, Sportswear stopped selling products with SCAD's word marks.

5

During discovery, SCAD provided several examples of Sportswear's products featuring its word marks and a printout of Sportswear's website-generated "SCAD" store. SCAD also submitted images of current merchandise sold on its own website and side-by-side comparisons of Sportswear's products. Sportswear conceded that it was selling products online with virtually indistinguishable reproductions of the "SCAD" and "SAVANNAH COLLEGE OF ART AND DESIGN" word marks, but asserted that its website contained a prominent disclaimer showing that the products were in no way affiliated with the school.

Since 2011, SCAD has licensed Follett Education Group to operate its online stores and Georgia-based on-campus bookstores, which sell clothing and other goods displaying SCAD's word marks. Sportswear agreed that Follett markets and sells SCAD's merchandise, but contested the degree of SCAD's involvement in approving and designing those items. SCAD admitted that it did not submit evidence showing when it first used its word marks on apparel or related goods.

At the close of discovery, the district court reviewed the parties' cross-motions for summary judgment and ruled in favor of Sportswear. Relying on *Jurado*, the district court held that SCAD failed to establish that its service mark rights extended to apparel because it could not show priority in use as to goods.

6

## II

We exercise plenary review of the district court's grant of summary judgment in favor of Sportswear, viewing the record and drawing all factual inferences in the light most favorable to SCAD.  *See Tana v. Dantanna's*, 611 F.3d 767, 772 (11th Cir. 2010).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III

Trademark law, as codified by the Lanham Act, *see* 15 U.S.C. § 1051 *et seq.*, largely serves two significant but often conflicting interests.  It "secure[s] to the owner of the mark the goodwill of his business[;]" and it "protect[s] the ability of consumers to distinguish among competing producers."  *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985).

The Lanham Act prohibits the infringement of trademarks that are used to identify "goods," and of service marks that are used to identify "services."  *See* 15 U.S.C. § 1127.  Trademarks and service marks are used "to indicate the source of the [goods and services], even if that source is unknown."  *Id*.  Generally, "a trademark serves to identify and distinguish the source and quality of a tangible

7

product," while "a service mark functions to identify and distinguish the source and quality of an intangible service."  3 McCarthy on Trademarks § 19:81.

In most respects, the "analysis is the same under both [types of marks] and courts thus treat the two terms as interchangeable in adjudicating infringement claims."  *Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1334 n.1 (11th Cir. 1999) (citations omitted).  For both trademarks and service marks, therefore, the "the touchstone of liability . . . is not simply whether there is unauthorized use of a protected mark, but whether such use is likely to cause consumer confusion."  *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007).  *See also* 4 McCarthy on Trademarks § 23:1 ("The test for infringement of a service mark is identical to the test of infringement of a trademark: is there a likelihood of confusion?").[3]

The Lanham Act provides different types of statutory protection.  As relevant here, § 32(a) of the Act, codified at 15 U.S.C. § 1114(1)(a), guards against

---

[3] Many other circuits also analyze trademarks and service marks under the same legal standards. *See, e.g., Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001) ("Service marks and trademarks are governed by identical standards."); *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1054 (6th Cir. 1999) (same); *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 n.2 (2d Cir. 1999) (same); *Walt-West Enterprises, Inc. v. Gannett Co., Inc.*, 695 F.2d 1050, 1054 (7th Cir. 1982) (same).  This analytical overlap likely contributes to the uncertainty about the scope of protection afforded to registered service marks. *See generally* Paul M. Schoenhard, *Why Marks Have Power Beyond the Rights Conferred: The Conflation of Trademarks and Service Marks*, 87 J. Pat. & Trademark Off. Soc'y 970, 971–72 (2005) (explaining that the two distinct forms of intellectual property have been treated as the same even though "service marks *did not exist* as a protectable form of intellectual property under [f]ederal law prior to the passage of the [Lanham Act]") (emphasis in original).

"infringement"—the "reproduction, counterfeit, copy, or colorable imitation of a registered mark"—while § 43(a), codified at 15 U.S.C. § 1125(a), protects against "false designation of origin," which we have referred to as "a federal cause of action for unfair competition." *Custom Mfg.*, 508 F.3d at 647 (citation omitted). A claim for infringement under § 1114(1)(a) lies only for federally-registered marks, while a claim under § 1125(a) is broader and may also be based on unregistered (i.e., common-law) marks. *See Jurado*, 643 F.3d at 1320.

The statutory claims at issue here more or less required SCAD to establish two things. First, SCAD needed to show "enforceable trademark rights in [a] mark or name[.]" Second, it had to prove that Sportswear "made unauthorized use of [its marks] 'such that consumers were likely to confuse the two.'" *Custom Mfg.*, 508 F.3d at 647 (describing the requirements for a § 1125 claim) (citation omitted); *Dieter v. B & H Indus. of Southwest Florida, Inc.*, 880 F.2d 322, 326 (11th Cir. 1989) (same for a § 1114 claim).

We, like other circuits, often blur the lines between § 1114 claims and § 1125 claims because recovery under both generally turns on the confusion analysis. *See Tana*, 611 F.3d at 773 n.5 (stating that the district court's error in analyzing a trademark case under § 1114 rather than § 1125 was irrelevant "because the district court based its grant of summary judgment on the likelihood-of-confusion prong"); *Tally-Ho, Inc. v. Coast Community Coll. Dist.*,

9

889 F.2d 1018, 1026 n.14 (11th Cir. 1989) ("an unfair competition claim based only upon alleged trademark infringement is practically identical to an infringement claim"). *Accord Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) (explaining that the "central inquiry is the same" for both § 1114 and § 1125); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006) (same); *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) (same). The district court here, however, never reached likelihood of confusion. Under the district court's rationale, the infringement claim under § 1114 necessarily failed because the limited federal registrations for "education services" meant that SCAD did not have rights as to "goods," and SCAD did not provide evidence showing that it used its marks on apparel before Sportswear.[4]

But the district court's reliance on *Jurado* for that rationale was misplaced. In *Jurado* neither party had a federally-registered trademark, *see* 643 F.3d at 1316, and as a result both sides could only assert common-law trademark rights. That is why priority of use became a critical issue in that case. As we explained: "Common-law trademark rights are appropriated only through actual prior use in commerce. . . . Crystal [the plaintiff] bore the burden of proving its prior use." *Id.* (citations and internal quotation marks omitted). Because SCAD's claims revolve

---

[4] Because the district court did not expressly distinguish between SCAD's statutory causes of action, we assume that its analysis applied to both the § 1114 and § 1125 claims.

around federally-registered marks, *Jurado* cannot inform our analysis of the infringement claim under § 1114, a provision which requires a federally-registered mark, or under § 1125, a provision which can apply to a federally-registered mark.

## IV

The question for us is whether SCAD has enforceable service mark rights that extend—beyond the services listed in its federal registrations—to goods in order to satisfy the first prong of an infringement analysis: the validity and scope of a contested mark. *See Dieter*, 880 F.2d at 326 (observing that a plaintiff must show that a mark is valid before a likelihood of confusion analysis becomes necessary). As we explain, we do not write on a clean slate, and *Boston Hockey* provides the answer to that question.

## A

Before discussing *Boston Hockey*, we analyze *University of Georgia v. Laite*, 756 F.2d 1535 (11th Cir. 1985), a case that SCAD also relies on. SCAD argues that *Laite* stands for the principle that even if a mark is registered only for services, the mark holder is entitled to broader protection in order to prevent *any* infringing conduct that is likely to cause confusion. *See* Appellant's Br. at 17–21. We disagree with SCAD's reading of *Laite*. Although at first glance the facts of that case closely resemble those here, there is one significant difference, and

11

SCAD's argument conflates the standards for service mark protection under § 1114 and § 1125.

In *Laite*, the University of Georgia Athletic Association sued to enjoin a novelty beer wholesaler from selling "Battlin' Bulldog" beer. *See* 756 F.2d at 1537. The UGAA sued the wholesaler under § 1125 and state trademark law, but it did not (and could not) sue for infringement under § 1114. *See id.* at 1538. SCAD correctly points out that the UGAA had filed state registrations for its marks only for "athletic services," but downplays a significant fact—at the time of the litigation, it had not yet acquired federal registrations for the contested "Georgia Bulldog" mark. *See id.* at 1537 & n.2. Federally-registered marks were not, as SCAD infers, part of the analytical line up in that case.

The key holding in *Laite* was that proof of secondary meaning (i.e., "the power of a name . . . to symbolize a particular business, product, or company") is only required for descriptive marks. *See id.* at 1540 (citation omitted). Reasoning that the "Georgia Bulldog" mascot was not a descriptive mark, we affirmed, on clear error review, the district court's finding that the UGAA had established a likelihood of confusion based on the similarity of the Bulldog designs and the beer wholesaler's intent. *See id.* at 1541, 1543–46. *Laite* therefore does not stand for the principle SCAD advocates. *See Belen Jesuit Preparatory Sch., Inc.*

12

*v. Sportswear, Inc.*, 2016 WL 4718162, at *6 (S.D. Fla. May 3, 2016) (explaining that *Laite* did not involve or analyze federally-registered marks).

**B**

Although *Laite* does not resolve the question before us, our binding 1975 decision in *Boston Hockey* stands on different footing.  As SCAD correctly asserts, *Boston Hockey* extends protection for federally-registered service marks to goods, and therefore beyond the area of registration listed in the certificate.

In *Boston Hockey*, the National Hockey League and twelve of its member teams sued to prevent a manufacturer from selling embroidered sew-on patches featuring the teams' federally-registered service marks.  *See* 510 F.2d at 1008.  Like SCAD, most of the hockey teams had registered marks only in connection with the provision of services, and held no registrations for goods, apparel, or promotional merchandise.  *See id.* at 1009.  Two of the hockey teams had also registered their marks for certain goods, *see Boston Prof'l Hockey Ass'n Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 360 F. Supp. 459, 461 (N.D. Tex. 1973), but we conducted the § 1114 infringement analysis without distinguishing the teams on that basis.  *See* 510 F.2d at 1011.

The *Boston Hockey* panel phrased the issue of first impression as "whether the unauthorized, intentional duplication of a professional hockey team's symbol . . . to be sold . . . as a patch for attachment to clothing, violates any legal right of

13

the team to the exclusive use of that symbol." *Id.* at 1008. As SCAD has done in this case, the NHL and its hockey teams sued for violations of §§ 1114 and 1125 of the Lanham Act, and for common-law unfair competition. *Id.* at 1009. The material facts here are very similar to those in *Boston Hockey*, with one main exception. The manufacturer in *Boston Hockey* sold only mark-replica patches, and did not affix the teams' marks to other goods such as t-shirts or jackets. *See id.* The panel acknowledged that trademark law generally protects against the sale of "something other than the mark itself," *see id.* at 1010, but concluded that each team had an interest in its mark "entitled to legal protection against such unauthorized duplication." *Id.* at 1008.

Recognizing that its "decision . . . [could] slightly tilt the trademark laws from the purpose of protecting the public to the protection of the business interests of [the teams]," the *Boston Hockey* panel was persuaded that granting relief was appropriate because the teams' efforts gave commercial value to the patches, and "the sale of a reproduction of the trademark itself on [a patch] is an accepted use of such team symbols" in the arena of professional sports. *See id.* at 1011. When it came to the statutory claim under § 1114, the panel reasoned that the teams' marks were validly registered and skipped straight to determining whether the manufacturing company's use was likely to cause confusion. *See id.* Absent from the panel's analysis was an explanation for how or why the teams' registrations for

14

"hockey entertainment services" provided statutory protection as to goods like embroidered patches.

In the end, the *Boston Hockey* panel rejected the manufacturer's argument that consumer confusion must derive from the "source of the manufacture" of the mark because the mark, "originated by the team, [was] the triggering mechanism for the sale of the [patch]." *Id.* at 1012. In other words, "[t]he confusion . . . requirement [wa]s met by the fact that the [manufacturer] duplicated the protected trademarks and sold them to the public knowing that the public would identify them as being the teams' trademarks." *Id.*

*Boston Hockey*, though in our view lacking critical analysis, implicitly but necessarily supports the proposition that the holder of a federally-registered service mark need not register that mark for goods—or provide evidence of prior use of that mark on goods—in order to establish the unrestricted validity and scope of the service mark, or to protect against another's allegedly infringing use of that mark on goods. On remand, the district court will have to review SCAD's claims under § 1114 and § 1125 in light of *Boston Hockey*.[5]

Among other things, the district court will need to assess the strength of SCAD's word marks. *See, e.g., Welding Servs., Inc. v. Forman*, 509 F.3d 1351,

---

[5] Given that *Boston Hockey* controls, we need not and do not address whether SCAD used its word marks on apparel prior to Sportswear or whether the district court properly excluded an article on a website submitted by SCAD.

15

1357–58 (11th Cir. 2007) (describing the "four gradations of distinctiveness"). And it will have to consider whether SCAD has demonstrated that Sportswear's use of its word marks is likely to create consumer confusion as to origin, source, approval, affiliation, association, or sponsorship. *See Burger King Corp. v. Mason*, 710 F.2d 1480, 1491–92 (11th Cir. 1983); *Professional Golfers Ass'n of Am. v. Bankers Life & Casualty Co.*, 514 F.2d 665, 670 (5th Cir. 1975).

Once a party has shown an enforceable right in a mark, a court usually considers a number of factors in assessing whether an infringing use is likely to cause confusion. These are "(1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public." *Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016). Generally, "the type of mark and the evidence of actual confusion are the most important" factors. *Id*. (citation omitted); *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 935 (11th Cir. 2010).

We add one final note about the confusion analysis. The confusion discussion in *Boston Hockey*, 510 F.2d at 1012, came under strong criticism

16

because it "did not require proof of a likelihood that customers would be confused as to the source or affiliation or sponsorship of [the] defendant's product," and instead only asked whether "customers recognized the products as bearing a mark of the plaintiff[s]."  4 McCarthy on Trademarks § 24:10 (describing the "heresies" of *Boston Hockey* and concluding that its "attempt to stretch trademark law failed").  *See also* Stacey L. Dogan & Mark A. Lemley, *The Merchandising Right: Fragile Theory or Fait Accompli?*, 54 Emory L.J. 461, 474 (2005) ("The court [in *Boston Hockey*] . . . presumed actionable confusion based solely on the consumer's mental association between the trademark and the trademark holder.").

In a binding decision issued only two years later, however, we read *Boston Hockey* narrowly, limited its confusion analysis to the facts in the case, and explained that it did not do away with traditional confusion analysis.  *See Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 389 (5th Cir. 1977) ("[W]e do not believe *Boston Hockey* equates knowledge of the symbol's source with confusion sufficient to establish trademark infringement, and we deem the confusion issue unresolved by our existing decisions.").  The current Fifth Circuit echoed that discussion and similarly retreated from a broad reading of *Boston Hockey*.  *See Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 485 (5th Cir. 2008) (reiterating "that a showing of likelihood of confusion [i]s still required [and] . . . not[ing] that the

17

circumstances in *Boston Hockey* supported . . . 'the inescapable inference that many would believe that the product itself originated with or was somehow endorsed by [the teams]'") (citation omitted); *Supreme Assembly, Order of Rainbow for Girls v. J. H. Ray Jewelry Co.*, 676 F.2d 1079, 1084–85 & n.7 (5th Cir. 1982) (clarifying that confusion must stem from a perceived connection between the product and the rightful owner of the mark because "[i]t is not enough that typical buyers purchase the items because of the presence of the mark").[6]

So, although the district court on remand is to apply *Boston Hockey* as to the validity and scope of SCAD's service marks, it will have to analyze what impact, if any, the case has on the confusion issue.

## C

We pause to note the unexplained analytical leap in *Boston Hockey*. Under the Lanham Act, registration is "*prima facie* evidence of the *validity* of the registered mark . . . , of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or *in connection with the goods or services specified in the registration*." § 1115(a) (emphasis added). If that is so, then one would think that there should be some legal basis for extending the scope of a registered service mark in a certain field

---

[6] In passing, we note that *Laite* has also been recognized—albeit to a much lesser extent—as providing protection where the owner of a common-law mark has not adequately established confusion as to the origin of a contested product. *See, e.g.*, Steve McKelvey & Ari J. Sliffman, *The Merchandising Right Gone Awry: What "Moore" Can Be Said?*, 52 Am. Bus. L.J. 317, 343 (2015) (discussing the "judicial trend expanding the concept of a 'merchandising right'").

(e.g., educational services) to a different category altogether (e.g., goods). As we have noted elsewhere, "[d]etermining whether an infringement has taken place is but the obverse of determining whether the service mark owner's property right extends into a given area." *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 839 (11th Cir. 1983).

Yet *Boston Hockey* does not provide any basis for extending service mark rights to goods. This silence is potentially problematic for several reasons.

First, other circuits have said that service marks do not by their nature extend to goods or products. *See Murphy v. Provident Mut. Life Ins. Co. of Philadelphia*, 923 F.2d 923, 927 (2d Cir. 1990) ("Clearly, the term ['services' in the Lanham Act] does not apply to goods or products."); *Application of Radio Corp. of Am.*, 205 F.2d 180, 182 (C.C.P.A. 1953) ("Clearly had Congress intended service marks to apply to goods or products, we believe it would have so stated."). *See also* A. Samuel Oddi, *The Functioning of 'Functionality' in Trademark Law*, 22 U. Houston L. Rev. 925, 958 (1985) ("In fact, the marks that had been registered by the hockey teams [in *Boston Hockey*] were service marks, and it may be questioned whether it is appropriate to extend service mark protection to 'goods' [the patches]."). If these other circuits and commentators are wrong, in whole or in part, we should explain why.

19

Second, a right in a mark is not a "right in gross." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918). This means that "[t]here is no property in a [mark] apart from the business or trade in connection with which it is employed." *American Steel Foundries v. Robertson*, 269 U.S. 372, 380 (1926) (addressing trademarks). The decision in *Boston Hockey*, however, seems to provide the holder of a service mark with a form of monopolistic protection, a so-called "independent right to exclude." 4 McCarthy on Trademarks § 24:10. *See also United States v. Giles*, 213 F.3d 1247, 1250 (10th Cir. 2000) (noting that even though the teams in *Boston Hockey* "had not registered their marks for use on patches, the [former Fifth Circuit] essentially gave the[m] a monopoly over use of the trademark in commercial merchandising"); *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 919 (9th Cir. 1980) ("Interpreted expansively, *Boston Hockey* holds that a trademark's owner has a complete monopoly over its use, including its functional use, in commercial merchandising. But our reading of the Lanham Act and its legislative history reveals no congressional design to bestow such broad property rights on trademark owners.") (footnote omitted).

Third, it is well-settled that trademark (and service mark) rights are derived through use, *see, e.g., United Drug*, 248 U.S. at 97, and we have not critically analyzed whether the procedural advantages of a mark's registration, *see Laite* 756 F.2d at 1541, or incontestability, *see Dieter*, 880 F.2d at 325–26, can serve as a

20

basis for expanding the scope of service mark protection to a tangible good or product.  *See* 3 McCarthy on Trademarks § 19:3 (explaining that**,** although registering a mark provides procedural and legal benefits, "the registration does not create the trademark"); *id.* at § 32:141 (observing that "the case law usually discusses incontestability when a plaintiff asserts incontestability as the source of its right to be secure from a challenge to the validity of its mark").  *Cf. In re Save Venice N.Y., Inc.*, 259 F.3d 1346, 1353 (Fed. Cir. 2001) (observing that "[a] registered mark is incontestable only in the form registered and for the goods or services claimed").

We recognize that, as to federally-registered trademarks, we have not limited protection to the actual product or products listed in the certificate of registration.  "The remedies of the owner of a registered trademark," we have held, "are not limited to the goods specified in the certificate, but extend to any goods on which the use of an infringing mark is 'likely to cause confusion.'"  *Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 861 (5th Cir. 1967) (citation omitted).  *See also E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985) (examining the similarity of products factor, we acknowledged that registered trademark rights may "extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods").  *Accord* 6 McCarthy on Trademarks §§ 32:137, 32:152.  Yet

21

extending the scope of a registered trademark (which identifies "goods") to a different product appears to be qualitatively different from extending the scope of a registered service mark (which identifies "services") to a different category of "goods."

There may be a sound doctrinal basis for what *Boston Hockey* did.  But unless the concept of confusion completely swallows the antecedent question of the scope of a registered mark, we have yet to hear of it.

## V

On some level, we understand that allowing a party to "take a free ride on another's registered trademark," *see B. H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1261 (5th Cir. 1971), simply feels wrong.  Trademark rights, however, do "not confer a right to prohibit the use of [a] word or words" generally and exist "to protect the owner's good will against the sale of another's product as his." *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924).

If *Boston Hockey* did not exist, the district court's rationale might provide a reasonable way of analyzing the alleged infringement of registered service marks through their use on goods.  But *Boston Hockey* is in the books, and it compels reversal of summary judgment in favor of Sportswear.  Although there may be "error in [that] precedent," *United States v. Romeo*, 122 F.3d 941, 942 n.1 (11th Cir. 1997), we do not have the authority, as a later panel, to disregard it.  The case

is remanded to the district court for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**