[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11176
_____

D.C. Docket No. 8:15-cv-00990-SDM-TGW


YELLOWFIN YACHTS, INC.,

                                                          Plaintiff–Appellant,

versus

BARKER BOATWORKS, LLC,
KEVIN BARKER,

                                                          Defendants–Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 7, 2018)

Before TJOFLAT, ROSENBAUM and BRANCH, Circuit Judges.

TJOFLAT, Circuit Judge:

I.

Yellowfin Yachts, Inc. is a manufacturer of high-end fishing boats.  Since 2000, Yellowfin has produced predominantly "center-consoled, open-fisherman styled boats" ranging between twenty-one and forty-two feet.  According to Yellowfin, these boats all have the same "swept" sheer line, meaning a gently sloped "s"-shaped line that runs upward from the point at which a boat's hull intersects with the deck to the boat's lofted bow.[1]  This swept sheer line, described by Yellowfin as "unique," is the subject of its trade dress claims.[2]



(Twenty-four-foot Yellowfin boat.)

---

[1] Yellowfin also produces a seventeen-foot "flats boat."  Its flats boat lacks the sheer line at issue.

[2] The sheer line for which Yellowfin is claiming trade dress protection here does not include the dramatically sloped portion appearing at the stern of the twenty-six-foot Yellowfin pictured below.

2



(Twenty-six-foot Yellowfin boat.)

Yellowfin hired Kevin Barker in 2006 as a vice president of sales. Although Yellowfin presented Barker with a proposed employment agreement which included confidentiality clauses, Barker never executed the agreement. Barker left Yellowfin in 2014—not encumbered by a noncompetition or nonsolicitation contract—and founded a competitor, Barker Boatworks, LLC. On his last day at Yellowfin, Barker downloaded hundreds of files from Yellowfin's main server. These files contained "detailed purchasing history and specifications for all of Yellowfin's customers," as well as "drawings" and "style images" for Yellowfin boats and "related manufacturing information."[3]

After leaving Yellowfin, Barker retained marine architect Michael Peters to design a twenty-six-foot bay boat based on Barker's specifications. These

---

[3] Barker claims that he did so to ensure that he was properly compensated through commissions.

3

specifications, according to Yellowfin, were derived directly from Yellowfin's own bay boats, and the Barker boat's sheer line nearly replicated that of Yellowfin. Barker Boatworks opened for business in July 2014 and has since competed with Yellowfin in the same "niche" center-console fishing-boat market.



(Barker Boatworks "Calibogue Bay" boat.)

In April 2015, Yellowfin filed a complaint against Barker Boatworks and Kevin Barker[4] in the United States District Court for the Middle District of Florida. With leave of court, Yellowfin filed its First Amended Complaint, the operative complaint here, in September. In this complaint, Yellowfin pleads claims for trade dress infringement and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), common-law unfair competition, common-law trade dress infringement, and violation of Florida's Trade Secret Act.[5]

---

[4] For ease of reading, we generally do not distinguish between the two defendants and we refer to them interchangeably.

[5] Yellowfin also claims that the defendants violated Florida's Trade Secret Act pursuant to a conspiracy.

4

After unsuccessfully moving to dismiss Yellowfin's complaint, Barker Boatworks moved for summary judgment on all of Yellowfin's claims. The District Court granted the motion in full. First, the Court provided three reasons why Yellowfin's Lanham Act trade dress claim failed: Yellowfin did not adequately describe any distinctive feature of its sheer line, its sheer line is functional and thus not protectable as trade dress, and no reasonable jury could conclude that a potential buyer would likely confuse a Barker boat for a Yellowfin. The Court then held that, because a reasonable jury could not conclude that a potential buyer would likely confuse the two boats, Yellowfin's claims of Section 43(a) false designation of origin, common-law trade dress infringement, and common-law unfair competition also fail. Finally, the Court found that Yellowfin failed to identify a protectable, misappropriated trade secret, and, regardless, that Yellowfin did not make "reasonable efforts" to protect all of its alleged trade secrets. The Court therefore rejected Yellowfin's trade secret claim. Yellowfin appeals these rulings.

---

We note that Yellowfin's trade secret claim could conceivably have been pleaded as a conversion claim, as Barker essentially stole a bundle of Yellowfin's information and data—whether this information was a "trade secret" or not—on his way out. "Conversion is an 'act of dominion wrongfully asserted over another's property inconsistent with his ownership therein.'" *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009) (quoting *Thomas v. Hertz Corp.*, 890 So. 2d 448, 449 (Fla. Dist. Ct. App. 2004)). Under Florida law, a conversion action can be brought related to the copying of a non-rival good, such as a confidential customer list. *See Warshall v. Price*, 629 So. 2d 903, 905 (Fla. Dist. Ct. App. 1993) (recognizing a conversion claim where the defendant copied and took, but did not delete or otherwise deprive the plaintiff of, plaintiff's confidential patient list).

5

We review a district court's grant of summary judgment *de novo* and construe the evidence and draw all reasonable inferences therefrom in the light most favorable to Yellowfin. *Ziegler v. Martin Cty. Sch. Dist.*, 831 F.3d 1309, 1318 (11th Cir. 2016). We first address the District Court's trade dress rulings.

II.

Section 43(a) of the Lanham Act provides a cause of action for trade dress infringement. *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997). Trade dress is defined as "the total image of a product," which "may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983). A typical trade dress action involves a good's packaging or labeling, but the design of a product, or a feature of a product, may also constitute protectable trade dress. *See id.* The plaintiff must prove three elements to prevail on a trade dress claim: "1) its trade dress is inherently distinctive or has acquired secondary meaning, 2) its trade dress is primarily non-functional, and 3) the defendant's trade dress is confusingly similar." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1535 (11th Cir. 1986). We

narrow our focus to the third requirement, likelihood of confusion, as we conclude that factor is dispositive in favor of Barker Boatworks.[6]

Trademark law's familiar "likelihood of confusion" test is used to assess trade dress claims. *See John H. Harland Co.*, 711 F.2d at 981.  We consider (1) the strength of plaintiff's trade dress, (2) the similarity of the products' designs, (3) the similarity of the products themselves, (4) the similarity of the parties' trade channels and customers, (5) the similarity of advertising media used by the parties, (6) the defendant's intent, and (7) the existence and extent of actual confusion in the consuming public. *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016); *AmBrit*, 812 F.2d at 1538.  We recognize that aspects of one factor will overlap with aspects of the others.  Therefore, we do not decide which party is favored by each factor, tally up the score, and hold in favor of the party with the most points.  We apply the factors holistically.  That said, the existence and extent of actual confusion and the strength of the plaintiff's trade dress are, respectively, the most and second most important factors. *Fla. Int'l*, 830 F.3d at 1256, 1264.  Those factors have the strongest influence on the question the test was created to assess: the likelihood of consumer confusion.

---

[6] "[A]s all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold." *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1202 (11th Cir. 2004) (alteration in original) (quoting *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1039 (11th Cir. 1996)).  Because we conclude that the District Court properly held that no reasonable jury could find that Barker Boatworks' trade dress would likely confuse the purchasing public, we do not address the other two requirements.

7

Although likelihood of confusion is a question of fact, it may be decided as a matter of law. *Tana v. Dantanna's*, 611 F.3d 767, 775 & n.7 (11th Cir. 2010). "The role of the [district] court in reviewing a motion for summary judgment is to determine the ultimate question of whether, in light of the evidence as a whole, there is sufficient proof of a likelihood of confusion to warrant a trial of the issue." *Id.* at 775 n.7. Because we review the district court's decision *de novo*, using the same legal standards it employed, our role is effectively the same. *See Ziegler*, 831 F.3d at 1318.

Yellowfin's primary argument is not that consumers are likely to accidentally purchase a Barker boat instead of a Yellowfin due to Barker's allegedly similar sheer line. Rather, its theory of confusion centers on confusion in the postsale context: consumers might see a Barker boat sporting a Yellowfin-like sheer line and mistakenly believe that boat to be a Yellowfin. *See Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 650 (11th Cir. 2007) (recognizing "likelihood of confusion in the post-sale context" as a viable basis for an action); *Montgomery v. Noga*, 168 F.3d 1282, 1301 n.32 (11th Cir. 1999) ("[P]resale confusion of actual purchasers is not the only type of confusion actionable under the Lanham Act."). We apply the factors with that theory in mind and ultimately hold that, as a matter of law, no reasonable jury could find a likelihood of confusion between the Barker and Yellowfin boats.

8

A. *Strength of Yellowfin's Trade Dress*

The District Court reasoned that because sweeping sheer lines are "ubiquitous" in the center-console fishing-boat market, "Yellowfin's purportedly 'distinctive' feature deserves little protection." Indeed, Wylie Nagel, Yellowfin's founder, conceded that several other boats have a sweeping sheer line. Thus, the District Court concluded, Yellowfin's sheer line is weak trade dress.

Yellowfin pushes back on this reasoning, contending that even though sweeping sheer lines are common among fishing boats, *its* sweeping sheer line stands out from those of other boats—it is unique and, to consumers, synonymous with Yellowfin's high-quality boats. Yellowfin provides the following excerpts from boating magazines to support this point:

- "Yellowfin Yachts has earned a reputation for producing some of the most jaw-dropping center-console fishing machines on the market," with "good looks and sleek design" that "are easily recognizable, even from far distances."

- "Ever wonder if you took the logos off many boats today whether you'd still be able to tell them apart? You'll never have difficulty discerning a Yellowfin. From the proud bow to the sweeping sheer, a Yellowfin is unmistakable."

- "Looking at this 29-footer's profile, you can't possibly mistake it for anything but a Yellowfin with its distinctive proud bow and dramatically sloping sheer line."

These excerpts, however, hardly bolster Yellowfin's argument. The first simply describes Yellowfin boats as "sleek" and "easily recognizable." Although Yellowfin's sheer line might contribute to the "sleekness" and, to an extent, the

9

recognizability of its boats, the excerpt leaves this to inference.  And it takes quite an inferential leap to connect this excerpt, which makes no reference to the sheer line, to Yellowfin's claim that its sheer line—one among many in the market—is so unique as to be synonymous with its product.  The second excerpt is more probative.  It homes in on the sweeping sheer line's ability to signify a Yellowfin boat.  But it also attributes recognizability to the "proud bow" of Yellowfin boats, which is not part of the claimed trade dress, and seemingly to other unnamed features as well, stating, "*From* the proud bow *to* the sweeping sheer, a Yellowfin is unmistakable."  (Emphasis added).  Finally, the third excerpt mentions only the "proud bow and dramatically sloping sheer line" of a twenty-nine-foot Yellowfin boat.  As with the "proud bow," the "dramatically sloping" portion of Yellowfin's sheer line is not part of its trade dress claim.[7]  Thus, the third excerpt says nothing about the trade dress at issue in this case.  Overall, even construed in the light most favorable to Yellowfin, these excerpts provide little support for Yellowfin's claim that its sweeping sheer line is particularly strong trade dress.

Aside from these excerpts, Yellowfin presents as evidence Nagler's declaration, in which he stated that he sought to create boats "that would have a unique and enduring style," that Yellowfin thus heavily markets its boats showing

---

[7] *Supra* note 2.

10

off the sheer line, and that Yellowfin customers "comment on, and identify" the Yellowfin sheer line.

A self-serving declaration "may create an issue of material fact and preclude summary judgment even if . . . uncorroborated." *United States v. Stein*, 881 F.3d 853, 854 (11th Cir. 2018) (en banc). But that is not to say that such a declaration will necessarily preclude summary judgment. *Id.* at 859. Nagler's statements do not focus on the signifying effect—*i.e.*, the strength—of the Yellowfin sheer line. Rather, he merely relays that he intended to create boats with a unique and enduring style, that Yellowfin heavily advertises its boats and sometimes the advertisements refer to the sheer line directly, and that customers mention the sheer line.[8] These statements fail to support the proposition that Yellowfin's sheer line causes consumers to associate the sheer line with its source, bringing to their minds the high-quality boats manufactured by Yellowfin.

In short, Yellowfin presents little evidence meaningfully supporting the strength of its trade dress. The effect of this shortcoming is amplified by the fact that many other boats in the relevant market have a sweeping sheer line. *Cf. Fla. Int'l*, 830 F.3d at 1257–58 (noting that "the strength of [Florida International

---

[8] This last point is hearsay. Yellowfin offers Nagler's out-of-court statement relaying what consumers have said for the truth it asserts—that customers comment on and identify Yellowfin's sheer line. *See* Fed. R. Evid. 801(c). "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (internal quotation marks and footnote omitted).

11

University's] word mark and [FIU] acronym" was naturally mitigated by "operat[ing] in a crowded field" of similar names and acronyms used by other Florida universities); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315–16 (5th Cir. 1981) (explaining that extensive third-party use of a particular word in plaintiff's trademark counsels against likely confusion).  Even relatively weak trade dress, though, may be entitled to a narrow range of protections.  *See Fla. Int'l*, 830 F.3d at 1260.  We thus continue our inquiry.

### B.  *Similarity of the Products' Designs*

The second likelihood of confusion factor focuses on the overall impression of the two products at issue.  *AmBrit*, 812 F.2d at 1540.  The District Court stated that Yellowfin and Barker Boatworks "sell a product generally similar in appearance," but noted that "several prominent differences permit a potential buyer to distinguish a Barker from a Yellowfin."  First, both Yellowfin and Barker Boatworks prominently display their respective logos, which "look nothing alike," on their boats.  Further, a Barker's hull differs from that of a Yellowfin, and Barker "omits the rolled transom typical of most Yellowfin models."[9]  Finally, citing Nagler's deposition, the District Court added plainly that "the layout of each boat

---

[9] The "transom" is the backmost section of a boat that connects the port and starboard sections of the hull—where a boat's name is typically displayed.  A "rolled" transom is as opposed to a "straight" transom.  The twenty-six-foot Yellowfin pictured above has a rolled transom, while the twenty-four-foot Yellowfin and the Barker boat pictured do not.

is different." These differences, the Court stated, "will preclude a potential buyer[] [from] mistaking a Barker for a Yellowfin."

Yellowfin argues that the District Court erred by failing "to address the *actual* Yellowfin trade dress—its unique sheer line." Had the District Court done so, Yellowfin continues, it would have found that the two sheer lines at issue are similar. Yellowfin concludes that the similarity between the sheer lines, combined with the Court's statement that both boats are "generally similar in appearance," tips this second likelihood of confusion factor in its favor.

Although Yellowfin's argument is weakened by the differences between its boats and those of Barker Boatworks—especially the different, prominently displayed logos—the mere presence of a distinguishing logo or other feature does not in all cases alleviate a likelihood of confusion. *See Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 822 (9th Cir. 1980) ("[N]othing of record indicates that the mere presence of [the defendant's] word mark avoids a likelihood of confusion."). *But see L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1134 (Fed. Cir. 1993) (stating that the "conspicuous and permanent" labeling on the parties' respective products avoided postsale consumer confusion). We more thoroughly engage with this principle *infra*, when discussing the "actual confusion" factor. For now, it suffices to say that the product design factor favors

13

Yellowfin, but this factor's value is almost completely washed out by our actual confusion analysis below.

### C. *Similarity of the Products*

Both parties manufacture high-end, center-console fishing boats of a similar size. This factor favors Yellowfin.

### D. *The Similarity of the Parties' Trade Channels and Customers*

Neither Yellowfin nor Barker Boatworks sells boats through a retail outlet; both sell directly to customers. This necessarily means that the parties operate in different trade channels, as a customer must contact either Yellowfin or Barker Boatworks directly to purchase a boat. The dissimilarity of trade channels, however, is mostly irrelevant given that Yellowfin's primary theory of likelihood of confusion applies to potential consumers *postsale*.

The two manufacturers compete in the same niche market and thus have similar customers. But having similar customers does not necessarily favor Yellowfin. These are customers in the market for a high-end, expensive fishing boat. As such, they are likely more discerning—and so less easily confused—than customers purchasing everyday products. *See Fla. Int'l*, 830 F.3d at 1256 (noting that "sophisticated consumers" of "complex goods" are less easily confused than "casual purchasers of small items"). We expand upon the effect that consumers'

sophistication has on Yellowfin's theory in our discussion of actual confusion below.

### E. *The Similarity of Advertising Media Used by the Parties*

As to this factor, the District Court stated the following:

Barker and Yellowfin concededly advertise in several of the same forums, including the magazines *SaltWater Sportsman* and *Sport Fishing*. Also, both companies attend the same boat shows, for example, Miami, Palm Beach, and Fort Lauderdale. The similarity of advertising forums might contribute to confusion, although the absence from the record of Barker advertisements prevents comparing the parties' advertisements. *See AmBrit*, 812 F.2d at 1542 (explaining that the "similarity of advertising" evaluates whether the parties advertise in similar forums and whether the advertisements appear similar).

(Record citations omitted). In its brief, Yellowfin emphasizes the first part of this statement; Barker Boatworks' brief emphasizes the latter part. This factor favors Yellowfin for purposes of summary judgment, as we may reasonably infer that similar advertising contributes, however little, to consumer confusion. *See AmBrit*, 812 F.2d at 1542 ("If the plaintiff and defendant both use the same advertising media, a finding of likelihood of confusion is more probable.").

### F. *Barker's Intent*

The District Court found that "the record contains no evidence that Barker copied Yellowfin's design in an attempt to confuse a potential buyer." Yellowfin disagrees, contending that the Court did not construe the record, as it must on summary judgment, in a way that takes "the plaintiff's best case." *See Stephens v.*

15

*DeGiovanni*, 852 F.3d 1298, 1313–14 (11th Cir. 2017).  Yellowfin adds that a defendant's intent is generally a credibility question that cannot be decided on summary judgment.

More specifically, Yellowfin argues that because Barker had "significant business dealings" with Yellowfin and took customer information with him upon leaving Yellowfin, "an inference of intent readily arises."  *See AmBrit*, 812 F.2d at 1543 n.61.  Further, Yellowfin adds that to successfully compete in the same "niche market" as Yellowfin, Barker Boatworks copied Yellowfin's sheer line, aware that the sheer line had garnered extensive favorable press.[10]  Finally, Yellowfin points out that an employee of Michael Peters, the marine architect Barker Boatworks employed to design its bay boat, met with Barker in June 2014 and left with design notes containing a notation to look at "24 Yellowfin."  The employee's notes also contained several sketches of plans for the Barker boat, one of which was titled "Yellowfin 24."  All of this, Yellowfin contends, is enough to create a material factual issue as to intent.

In response, Barker Boatworks points out that notes from the June 2014 meeting also show that Barker "did not care for the Yellowfin hull and sheer line appearance," evidenced by his comment that Yellowfins look "[too] much offshore" and have "too much fla[ir]."  Barker Boatworks adds that several

---

[10] Yellowfin cites back to the magazine excerpts quoted *supra*.  As discussed, these excerpts do little to prove the strength of Yellowfin's sheer line as trade dress.

competing bay boats other than Yellowfin were also mentioned at the meeting. Yellowfin, Barker Boatworks contends, seeks to improperly infer intent from mere references to Yellowfin and from prior business dealings.  Moreover, the District Court made no credibility finding because there was no dispute in the record about the meaning of any relevant testimony or the meeting notes.

There is a difference between intentional copying and intentional copying *with intent to cause confusion.  See Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 859 n.13 (11th Cir. 1983).  This distinction is an important one.  If a defendant intentionally copies an aspect of the plaintiff's product, but not with intent to confuse consumers, then the defendant's intent has little bearing on the ultimate question: whether the allegedly infringing product is likely to confuse consumers.  *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:110 (5th ed. 2017) ("[T]he only kind of intent that is relevant to the issue of likelihood of confusion is the intent to confuse.").  "Strictly, intent, or lack thereof, does not affect the eyes of the viewer."  *Chrysler Corp. v. Silva*, 118 F.3d 56, 59 n.3 (1st Cir. 1997).  But when a defendant copies a design intending to cause confusion, a tenable inference may be drawn that this will cause confusion in fact; the defendant's very action indicates that it expects consumer confusion. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 158 (9th Cir. 1963); McCarthy, *supra*, at § 23:110.  In this latter instance, we may presume that

17

the defendant "adopt[ed] a mark or design with the intent of deriving benefit from another person's mark" and deny the defendant's summary judgment motion. *Brooks*, 716 F.2d at 860 n.13 (internal quotation marks omitted).

In sum, proof of intentional copying alone is not conclusive on the likelihood of confusion issue. *Id.* The plaintiff must put forth some evidence showing that the defendant's copying was done with intent to confuse consumers.

Viewing the evidence in Yellowfin's favor allows us, at most, to infer that Barker Boatworks intended to copy some aspects of Yellowfin's boats in order to construct a worthy competitor in a niche market. That is Yellowfin's "best case." *See Stephens*, 852 F.3d at 1313–14. But evidence that "a junior user copies a competitor's product design because it sells better and consumers seem to like it . . . is not evidence of an intent to confuse." McCarthy, *supra*, at § 8:19. The District Court properly concluded that Yellowfin put forth no evidence showing Barker's intent to copy Yellowfin's sheer line in order to deceive consumers as to the source of Barker Boatworks' boats—*i.e.*, to cause consumer confusion.

## G. *Actual Confusion*

Finally, the District Court found that Yellowfin failed to present any evidence of actual confusion. The Court stated that Yellowfin did not "identify a customer who mistakenly bought a Barker instead of a Yellowfin." Further, the Court noted, the high price tags attached to center-console fishing boats likely

18

encourage consumers to exercise a high degree of care when purchasing a boat. Therefore, a similar sheer line will not reasonably cause a customer to mistakenly purchase a Barker instead of a Yellowfin.  The Court then briefly addressed postsale confusion, stating that postsale confusion "requires a showing that the junior product is inferior in craftsmanship to the senior product."  The Court noted that Yellowfin produced only an "unsubstantiated boast" by Nagler in his deposition testimony that Yellowfins are "far" superior in quality to Barkers.[11]  On the other hand, several former Yellowfin customers—who had first-hand experience of Yellowfin's craftsmanship and were likely to investigate that of Barker Boatworks before investing in another boat—bought a Barker.  Thus, because Yellowfin did not present evidence sufficient to show Barker boats were of a lesser quality, the Court halted its analysis of postsale confusion.

Yellowfin's appellate brief initially presents a point-of-sale-type theory of confusion, arguing that Nagler, in his deposition, identified four potential customers whose business he lost to Barker and further maintained that "there's probably another handful."  But, as the District Court pointed out, Nagler did not attribute these lost sales to confusion, much less confusion derived from the

---

[11] Elsewhere in his deposition, Nagler stated that he had never ridden in a Barker boat but that he "assume[d]" Barker boats were "pretty close" to Yellowfins in quality.

19

similarity of the sheer lines specifically.[12]  Rather, it was general similarity in the boats' designs that led to the loss of sales.

Perhaps recognizing the weaknesses of a point-of-sale theory of confusion, Yellowfin ultimately contends that, primarily, "[t]his is a *post*-sale confusion case."  That is, "the point at which the likelihood of confusion would be most likely to occur is *after* the sale of a Barker boat, when the relevant audience is the 'purchasing public.'"  Yellowfin argues that the District Court erred by imposing a requirement that Yellowfin prove Barker boats to be of inferior quality.  Because this is not a threshold requirement to proving postsale confusion, Yellowfin continues, the Court never addressed its postsale-confusion theory.  If it had, Yellowfin concludes, it could not have granted summary judgment because there is a triable issue of fact about whether Barker's sheer line is likely to confuse potential purchasers in the postsale context.

Boiled down, Yellowfin's theory is this: its unique sheer line is instantly recognizable to potential purchasers.  Upon seeing a Barker with a similar sheer line, potential purchasers become confused—they mistakenly believe that the boat they see is a Yellowfin or is associated with Yellowfin.  This, in turn, has damaged

---

[12] In his deposition, Nagler summarily stated that Barker's copying of Yellowfin's sheer line specifically caused the lost customers.  But, immediately after making this statement, Nagler also attributed the lost customers to Barker giving customers a lower price than Yellowfin could offer and to "the relationship that [a former Yellowfin customer] had with [Kevin Barker]."  Either way, he did not testify that *confusion* caused the lost sales.

the goodwill associated with Yellowfin's brand and has diverted consumers from Yellowfin, causing lost profits.

"Actual consumer confusion is the best evidence of likelihood of confusion." *AmBrit*, 812 F.2d at 1543. We review this factor holistically; there is no precise number of instances of actual confusion sufficient to establish the factor. *Id.* Although it takes "very little evidence to establish the existence of the actual confusion factor," *id.* at 1544, the evidence adduced must be more than "nominal," *Tana*, 611 F.3d at 779.[13] Further, "[l]ikelihood of confusion is synonymous with 'probable' confusion—it is not sufficient if confusion is merely 'possible.'" McCarthy, *supra*, at § 23:3 (citing *Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1355 n.2 (11th Cir. 1983)). That a junior user's trade dress merely calls to mind that of the senior user, moreover, is not an infringement. *Id.* at § 23:5.

Yellowfin is correct that this Court's precedent does not require a threshold showing that the defendant's product is inferior in quality. And we do not impose such a requirement today.[14] That notwithstanding, the record is devoid of evidence

---

[13] The *Tana* Court found "nominal" an affidavit by a patron of plaintiff's restaurant stating he patronized defendant's restaurant because similarity in the restaurants' names led him to believe they were affiliated, and defendant's admission that customers had twice inquired about an affiliation between the restaurants. 611 F.3d at 779. It accordingly affirmed the district court's grant of summary judgment in favor of defendant. *Id.* at 783.

[14] The District Court's error on this point does not necessitate a remand to further address Yellowfin's postsale-confusion theory. *See Dippin' Dots*, 369 F.3d at 1207–08 (stating that a

21

indicating a probability of postsale confusion among potential purchasers.[15]

Yellowfin effectively argues that the District Court should have inferred from the

---

"district court's failure to consider all the factors relevant to the issue of whether two marks are confusingly similar does not necessarily constitute reversible error" (internal quotation marks omitted)).

We note that the quality of a defendant's product is relevant to the harm suffered by the plaintiff. The "classic situation" of postsale confusion occurs when "an observer sees the defendant's inferior product and because of similar . . . trade dress, mistakenly thinks it is a product of plaintiff, damaging plaintiff's reputation and image." McCarthy, *supra*, at § 23:7; *see United States v. Torkington*, 812 F.2d 1347, 1353 (11th Cir. 1987) (stating, with regard to counterfeit goods, that a "trademark holder's ability to use its mark to symbolize its reputation is harmed when potential purchasers of its goods see unauthentic goods and identify these goods with the trademark holder"). This damage to reputation and image is naturally mitigated when an observer mistakenly associates a product of similar quality with the plaintiff. Thus, although Yellowfin's lack of proof of the Barker boats' inferiority is not dispositive of the actual confusion factor on summary judgment, it raises the question of what, if any, negative effect postsale confusion could have on Yellowfin's reputation and image. We need not answer that question here.

[15] Yellowfin proffered a survey to support its position on likelihood of confusion. The District Court, however, excluded the survey due to several methodological flaws. That ruling is not an issue on appeal.

Nagler's own testimony, moreover, does not support Yellowfin's postsale-confusion theory. Consider the following exchange at his deposition:

Q. Okay. Have there been any – anybody that's come to you with confusion between Barker and Yellowfin?

A. Several people have come to me with discussions about how [Barker] copied our styling and our sheer line of the boat and, you know, felt it was wrong.

True, you know, did they come in confused between the two brands? Well, they know who Yellowfin is. They don't know who Barker is, but they know when they see that [Barker] boat on the water, it looks like a Yellowfin.

Q. And who was that?

A. Customers call us all the time, people on the Internet. There's plenty of documentation all over the Internet. Go to any of the forums.

Nagler then identified specific customers who expressed to him that Barker copied Yellowfin's style or stated that they could not tell the two boats apart. When asked if any customer was "confused," Nagler responded, "I would think copying and confusion [are] the same." Nagler then stated, "If you took the sticker off the back of [a Barker], you would probably be confused."

22

strength of its trade dress alone—which, as discussed, is suspect—actual confusion in the postsale context. But, without any evidence corroborating its postsale confusion theory outlined above, Yellowfin cannot defeat summary judgment. *See Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1363 (7th Cir. 1995) ("A finding of likely confusion can no more be based on pure conjecture or a fetching narrative alone than any other finding on an issue on which the proponent bears the burden of proof.").

Indeed, the market in which Yellowfin competes and the potential purchasers therein make its theory of postsale confusion *unlikely*. Yellowfin repeatedly mentions that it and Barker Boatworks compete in the same "niche" market of center-console fishing boats. We may infer that potential purchasers of products in this market are relatively sophisticated. *See Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 510–11 (6th Cir. 2013)

---

After this, Nagler clarified that Yellowfin's claim was limited to the copying of its sheer line and agreed that several features of the Barker boat differed from Yellowfin's boats.

To the extent it is offered for the truth it asserts, Nagler's testimony relaying the statements of the "[s]everal people" who expressed to him that Barker copied Yellowfin is inadmissible hearsay. *See* Fed. R. Evid. 801(c). Regardless, nothing in this exchange indicates that people were confused by Barker's sheer line. Nagler testified in effect that people believe Barker copied Yellowfin's boat styling, that confusion would be caused if the logo were removed from a Barker, and that the boats have many dissimilar features. Copying is not the same as confusion, as Nagler suggests. And Yellowfin presents no evidence showing that potential purchasers have observed Barker boats stripped of their logo. At best, Nagler's testimony could be construed to support the proposition that seeing a Barker might call the Yellowfin brand to a consumer's mind. This, however, is not tantamount to confusion. McCarthy, *supra*, at § 23:5.

(noting the relationship between a product's complexity and price and the sophistication of its consumers). In fact, Yellowfin's theory of postsale confusion depends upon sophisticated consumers. Yellowfin recognizes that that "every bay boat has a sloping sheer line as a key element of its design." (Emphasis removed). But in designing a sloping sheer line, Yellowfin posits, a designer employs "creativity with highly nuanced refinements" so that his sheer line will differ from the others—"that is precisely what Mr. Nagler did in designing the Yellowfin sheer line." A lay consumer unfamiliar with bay boats would be unlikely to notice the "highly nuanced refinements" of Yellowfin's sheer line and match the sheer line with the brand. Only a discerning, sophisticated consumer would be able to do so. Yellowfin's theory thus holds water only in a scenario involving a sophisticated potential purchaser.

However, without any corroborating evidence, it is unreasonable to infer that this discerning potential purchaser—familiar enough with the crowded bay-boat market to distinguish Yellowfin's sloping sheer line from the numerous others— would see a Barker and become confused despite the Barker's prominent and distinct logo, differing hull, and other dissimilar features. *See id.* at 509–11 (stating that the "starkly different" logos on two expensive products and the "the high degree of care presumably exercised by the [products'] sophisticated consumers" compels the conclusion that the plaintiff, as a matter of law, failed to

24

raise a triable issue as to likelihood of confusion).  Perhaps the Barker sheer line would "call[] to mind" that of a Yellowfin, but that is not an infringement.  *See* McCarthy, *supra*, at § 23:5.  Yellowfin has failed to establish that the Barker sheer line has actually confused potential purchasers in the postsale context.

*       *       *

Weighing the likelihood of confusion factors holistically, we conclude that the District Court did not err in holding that Yellowfin could not, as a matter of law, prove a likelihood of confusion between Barker Boatworks' trade dress and its own.  We therefore also hold that the District Court properly rejected the rest of Yellowfin's claims related to trade dress and consumer confusion.  We turn now to Yellowfin's remaining trade secret claim.

III.

The Florida Uniform Trade Secrets Act ("FUTSA") provides a cause of action for the misappropriation of trade secrets.  Fla. Stat. §§ 688.001–009.  "To prevail on a FUTSA claim, a plaintiff must demonstrate that (1) it possessed a 'trade secret' and (2) the secret was misappropriated."  *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 853 (11th Cir. 2017) (citing Fla. Stat. § 688.002; *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998)).  Under FUTSA, a "trade secret" is

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:

25

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).  "Misappropriation," generally, is defined as the acquisition of a secret "by someone who knows or has reason to know that the secret was improperly obtained or who used improper means to obtain it."  *Advantor*, 678 F. App'x at 853; *see* Fla. Stat. § 688.002(2).

Yellowfin claims two sets of information, both allegedly misappropriated by Barker, as trade secrets: "Source Information" and "Customer Information."  We start with the former.

## A.

Yellowfin describes its Source Information in the following manner:

In the course of building Yellowfin's boats, the company requires and incorporates into its boats materials and components from various sources.  Yellowfin considers its sources, the contracts it has with those sources and the terms and conditions of those contracts as trade secrets.[16]

---

[16] In opposition to Barker Boatworks' summary judgment motion, Yellowfin also argued that its Source Information included drawings and other customer and supplier information not identified in its complaint.  The District Court properly declined to address this argument in its decision granting Barker Boatworks summary judgment, citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004), for the proposition that a plaintiff cannot amend its complaint through argument in a brief opposing summary judgment.  Thus we also consider the Source Information only to include the contents quoted above.

26

This information, Yellowfin contends, is "valuable to its business and provide[s] a competitive edge to the company."

The District Court rejected Yellowfin's Source Information trade secret claim, providing a number of reasons supporting its conclusion that no reasonable jury could find the Source Information to constitute a trade secret. First, the Court held that the identities of Yellowfin's suppliers are typically well known—indeed, "the photos in the record show that many [of the suppliers] prominently brand their products." The Court also noted that Nagler conceded in his deposition that a supplier's identity is not a trade secret. Thus, the Court determined, the identities of Yellowfin's suppliers did not qualify as a trade secret.

Next, the Court concluded that the prices Yellowfin negotiated with its suppliers were also not trade secrets. The Court gave three reasons. First, the negotiated prices were based on the volume of Yellowfin's boat production. That is, Yellowfin produced enough boats to secure lower prices than a smaller boat company could. Nagler confirmed as much, stating, "[A] company . . . the size of [Barker's] wouldn't be able to make" the "deals that I make with my vendors." The Court therefore held that "[i]nformation about a volume discount lacks independent economic value to a producer too small to secure the discount." Second, the Court pointed out that Yellowfin stated that its discounts were based in part on the relationships it cultivated with its vendors over the course of a number

of years.  Information about these relationship-based discounts, the Court stated, lacks independent economic value to a newly established manufacturer.  Finally, the Court held that Yellowfin's claim also failed because Barker learned Yellowfin's production costs in the ordinary course of working at Yellowfin.  Thus, even if Barker could secure a supplier discount similar to Yellowfin's, an injunction could not practicably restrain Barker from using the knowledge he gained while employed at Yellowfin.[17]

In its appellate briefing, Yellowfin challenges none of these conclusions.  Nor does it identify any issues of material fact underlying the District Court's determinations.  Rather, Yellowfin only mentions summarily that its Source Information qualifies as a trade secret and that the District Court erred by conducting a fact-bound inquiry, better left for a jury, when determining otherwise.[18]  Although we recognize that whether something is a trade secret is a question typically "resolved by a fact finder after full presentation of evidence from each side," *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288–89

---

[17] *See Am. Red Cross*, 143 F.3d at 1410 (stating that an employer cannot preclude a former employee "from utilizing contacts and expertise gained during his former employment" (internal quotation marks omitted)); *see also Renpak, Inc. v. Oppenheimer*, 104 So. 2d 642, 645 (Fla. Dist. Ct. App. 1958) ("Skill and knowledge are assets gained by an employee which are transferable to his future use in business . . . .  It is impossible to leave them behind so long as they exist within the mind of the employee.").

[18] Yellowfin also summarily states that an implicit confidential relationship between it and Barker precluded Barker from using any confidential information, including the Source Information, for purposes other than benefitting Yellowfin.  We address and reject this point *infra*.

28

(5th Cir. 1978), Yellowfin fails to provide any reason why, in this case, the District Court erred in concluding that no reasonable jury could find that the Source Information constituted a trade secret. And, after reviewing the record, we fail to find any evidence suggesting that the District Court erred.

### B.

Yellowfin does, however, extensively contend that the District Court erred in determining that no jury could reasonably find that its Customer Information constituted a trade secret. Yellowfin's Customer Information is comprised of information that it has collected and stored about each of its customers, including "personal identifying information such as the person's name, address, contact information, and other information related to the customer's purchase."

The District Court provided two independent reasons for rejecting Yellowfin's Customer Information trade secret claim. It first noted that Florida Statutes § 328.48(2) requires vessel owners to register their vessels with the state, and the Public Records Act requires the state to openly provide registration information, including registrants' names and addresses. "With a registrant's name and address," the Court stated, "a person can use the Internet or the White Pages to find the registrant's contact information." Because the Customer Information's core contents are publicly available, the Court found that the information could not be a trade secret.

29

The District Court then held that even if the Customer Information was not publicly available, Yellowfin could not prove FUTSA's second trade secret requirement: that the information was "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Fla. Stat. § 688.002(4). Although Yellowfin protected its Customer Information by limiting employee access to it and maintaining it on a password-protected computer system, Yellowfin nonetheless "encouraged Barker to store [the] information on a personal laptop and phone."[19] Yellowfin's security measures were thus useless once it unrestrictedly relinquished the Customer Information to Barker. The Court also stressed that Yellowfin never asked Barker to delete the information from his personal devices after he left the company. Based on these facts, the Court concluded that no reasonable jury could find that Yellowfin engaged in reasonable efforts to secure the Customer Information.

Yellowfin contends that the District Court erred on both points. First, the Customer Information includes more than what one may derive from Florida's public vessel-registration records. In addition to names and addresses, the Customer Information contains detailed purchasing history, including the specifications customers requested when ordering their boats. Further, Yellowfin argues that uniquely compiling or distilling information, even if some of which is

---

[19] According to Nagler's declaration, the cellphone used by Barker was paid for by Yellowfin.

publicly available, adds value to the information and may render it a trade secret. *See Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 686 (11th Cir. 1998).

As to its reasonable efforts to maintain the Customer Information's secrecy, Yellowfin states that the information is held within its computer system which requires a username and password to access, is accessible by fewer than five percent of the company's employees, and is not accessible by or shared with third parties. Yellowfin also maintains that there was an "implicit understanding" between Yellowfin and Barker that its Customer Information was confidential and not to be disclosed outside Yellowfin or used for any purpose other than to benefit the company.

Exercising our liberty to affirm on any basis in the record, *United States v. Hall*, 714 F.3d 1270, 1271 (11th Cir. 2013), we affirm the District Court's rejection of Yellowfin's Customer Information trade secret claim because Yellowfin failed to reasonably protect the information. Yellowfin limiting employee access to the information and password-protecting the computer network on which the information resided were positive steps in securing the alleged trade secret. *See, e.g.*, *VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349, 1359 (S.D. Fla. 2012) (noting these measures as influential in reasonably securing trade secrets). But Yellowfin compromised the efficacy of these measures by encouraging Barker to keep the Customer Information on his cellphone and

31

personal laptop.  *Cf. Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1333–35 (N.D. Ga. 2007) (finding significant plaintiff's failure to prevent its employees from transferring a file allegedly constituting a trade secret to their personal computers).[20]  Indeed, Barker refused to sign an employment agreement which stated that he would, among other things, keep all Yellowfin trade secrets in confidence.  Further, Yellowfin neither marked the Customer Information as confidential nor instructed Barker to secure the information on his personal devices.  And when Barker left Yellowfin, the company did not request that Barker return or delete any of the information.

Thus, at bottom, Yellowfin's efforts to secure the Customer Information rest upon a purported "implicit understanding" between Yellowfin and Barker that the information was to be kept confidential.  Although "Florida law recognizes implied confidential relationships sufficient to trigger trade secret liability," this Court is "wary of any trade secret claim predicated on the existence of" such a relationship. *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1550 (11th Cir. 1996).  Yellowfin cites part of Nagler's Declaration as evidence of this relationship:

> Yellowfin employees, including Kevin Barker, understand, or should understand, that the company's Customer Information is confidential and proprietary to Yellowfin, because I personally have verbalized this policy and restriction to Yellowfin employees.   On several

---

[20] *Diamond Power* related to the Georgia Trade Secret Act which, like FUTSA, requires "efforts that are reasonable under the circumstances to maintain [a trade secret's] secrecy." O.C.G.A. § 10-1-761(4)(B).

occasions, Yellowfin was approached by outside companies desiring to gain access to [this information] . . . . Each time this happened, I expressly rejected such offers and told my employees, including Kevin Barker, that such information would never be sold or shared with outside companies."

Other than Nagler's general verbal statements warning employees not to share its Customer Information with third parties, Yellowfin references no evidence corroborating the implicit confidential relationship between it and Barker.

In sum, with mere verbal statements that the Customer Information should not be given to outsiders, Yellowfin relinquished the information to Barker, who refused to sign a confidentiality agreement, with no instruction to him as to how to secure the information on his cellphone or personal laptop. In doing so, Yellowfin effectively abandoned all oversight in the security of the Customer Information. Accordingly, the District Court did not err in determining that no reasonable jury could find that Yellowfin employed reasonable efforts to secure the information.[21]

## IV.

In light of the foregoing, we affirm the District Court's grant of summary judgment in favor of Barker Boatworks.

**AFFIRMED.**

---

[21] Because Yellowfin cannot identify an allegedly misappropriated trade secret meeting both definitional parts of Florida Statutes § 688.002(4), its FUTSA-predicated conspiracy claim also fails. *See supra* note 5.